CAPE AND VINEYARD DIVISION OF
the NEW BEDFORD GAS and Edison
Light Company,. Petitioners,

v.

OCCUPATIONAL SAFETY AND
HEALTH REVIEW COMMIS-
SION, Respondent.

No. 74–1223.

United States Court of Appeals,
First Circuit.

Argued Nov. 5, 1974.

Decided March 3, 1975.

Lawrence M. Kearns, Boston, Mass., with whom Morgan, Brown, Kearns & Joy, Boston, Mass., was on brief, for petitioners.

Morton A. Hollander, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., New York City, and Stephen F. Eilperin, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The employer, a public utility company, petitions this court to review a decision of the Occupational. Safety and Health Review Commission that the employer committed a serious violation of section 5(a)(2) of the Occupational Safety and Health Act, 29 U.S.C. § 654(a)(2), by failing to comply with a safety standard promulgated in a regulation under the Act. Because we are unable to discover substantial evidence in the record to support the Commission's finding of the violation, we reverse.[1]

The Act's goal is to eliminate dangerous conditions in the workplace. *Id.* § 651. Without affecting workmen's compensation remedies, *id.* § 653(b)(4), it imposes fines upon employers engaged in interstate commerce who fail to eliminate avoidable hazards to the health and safety of workers. Employer duties under the Act are of two kinds. The employer has a general duty to provide employees a work environment "free from recognized hazards that are causing or are likely to cause death or serious phys-

ical harm". *Id.* § 654(a)(1). In addition the employer must conform to specific health and safety standards promulgated by the Secretary of Labor. *Id.* §§ 654(a)(2), 655.[2] Dereliction of either duty is a violation of the Act quite apart from whether injury to an employee results. And while the occurrence of injury may be relevant to proving a violation, it is not conclusive. But the Act does provide for more severe penalties for a violation when, as here, death results. *Id.* § 666(b).

The case before us developed from an investigation by the Occupational Safety and Health Administration (OSHA) following the death by electrical shock of an employee of the company. OSHA issued a citation against the company for a serious violation of the Act[3] for failing to require employees to use necessary protective equipment as required by a promulgated safety standard.[4] The Secretary also issued a proposed penalty of $600 and ordered the company to abate the unsafe condition immediately. The company contested the citation and proposed penalty and order, and the case was heard before a Commission administrative law judge.

At the hearing it was shown that the fatal accident occurred while a company crew was working on a 40-foot utility pole next to a public road in South Orleans, Massachusetts. The pole was one of a series carrying electric wires in a north-south direction along the west side

---

1. This court has jurisdiction to review the Commission order under 29 U.S.C. § 660.

2. An employer in compliance with a promulgated standard is deemed to be in compliance with the general duty to the extent of that standard's coverage. 29 C.F.R. § 1910.5(f).

3. A serious violation is one which creates "a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment, unless the employer did not, and could not with the exercise of reasonable

diligence, know of the presence of the violation."
29 U.S.C. § 666(j).

4. The standard provides:
"Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact."
29 C.F.R. § 1910.132(a).

of the road. Immediately to the west of the pole was a tree-lined field, and to the east was the street. On the pole were two sets of parallel crossarms ten feet across, fastened with v-braces, and perpendicular to the road. Three energized wires were connected to the lower crossarm from the north: a primary wire six inches from the crossarm's street-side end, a primary wire at its center, and a primary wire six inches from its field-side end. These wires, as well as their securing clamps, were each charged with 2,400 volts. The upper set of crossarms had the same arrangement of wires from the south, and electricity flowed from the upper wires through three insulated wires to the three wires extending north from the lower set of crossarms seven feet below. Three secondary wires charged with 120 to 240 volts ran two feet below the lower crossarm's center primary wire.

The crew had completed installing one field-side transformer and one street-side transformer between the upper and lower crossarms on the south side of the pole before the accident. The transformers were grounded and were later to be connected to reduce the voltage flowing north. The bottom outside corner of the field-side transformer was seven-and-a-half inches above the lower crossarm and twelve inches from the live field-side wire and clamp.

First-class lineman Thayer went up to the north side of the pole to measure and cut a tap wire which was later to be connected to the field-side clamp. Since the tap came from the transformer's outside corner (four feet from the pole) and was coiled rather than hanging within easy reach, it was necessary for Thayer to stretch awkwardly, reach over the crossarms and through the 12-inch gap between the transformer and primary field-side wire to grab the tap, and pull the tap to within six inches of that live wire before cutting off the excess and bending the tap out of the way.

Thayer belted himself slightly to the north on the field side of the pole, between the pole's lower set of crossarms and the crossarm brace. He was wearing a hard hat and fourteen-and-a-half inch insulated rubber gloves which protected his lower forearms. Protective rubber line hose and hoods had been placed over the center primary wire on the lower crossarm and over the secondary wires extending south, but not over the outside primary wires and clamps and the secondary wires extending north. According to testimony, first-class lineman Fulcher, who was working with Thayer under the "buddy system" and located in a truck bucket hoisted on the opposite side of the crossarm and slightly above Thayer, asked Thayer if more rubber protective equipment was needed. When Thayer replied that he did not need more rubber and began to pivot and stretch towards the tap, Fulcher turned to a short task of trimming overhanging limbs on the field side. Fulcher was not watching when, a few seconds later, Thayer was electrocuted. Second-class lineman Estabrook and foreman Wittman, who had been observing the operations generally, also testified that they were not watching Thayer at the moment of contact.

The medical examiner found a number of burns on the upper left arm of Thayer's body and a similar large burn on the upper right arm. To be electrocuted, an unprotected part of Thayer had to touch both a live contact and a neutral ground. It was stipulated that he probably contacted the 2,400 volt field-side primary wire or its clamp with one arm and the grounded transformer with the other.

The administrative judge affirmed the citation and proposed penalty, finding that the foreman knew or should have known that there was substantial probability that death or serious injury could result from the failure to require Thayer to use protective equipment for the field-side primary wire and its clamp. The judge found that by letting Thayer decide not to use more protective rubber, the foreman violated the company's own safety rules as well as the safety standard under the Act. Observing that Thayer had only 12 days experience as a

# 1152

first-class lineman, the judge stated even in the case of an experienced first-class lineman the "safe course" would have been to cover the field-side primary wire and clamp because of the possibility of errors or slips that could occur to a lineman in an awkward and changing position on the pole.

After reviewing the record, the Commission affirmed the administrative judge's decision and order by a 2–1 vote. In dissent Commissioner Moran argued that the broad and obscure language in the relevant standard under the Act could be fairly interpreted only as requiring those safety precautions recognized as necessary by industry custom and practice as utilities understood it. In his view the evidence indicated that the company complied with these.

We agree with the dissenting commissioner that the language of the standard alleged to be violated affords little if any concrete guidance: protective equipment is to be required "wherever it is necessary by reason of hazards . . . encountered in a manner capable of causing injury . . . through physical contact." *See* note 3 *supra*. A regulation without ascertainable standards, like this one, does not provide constitutionally adequate warning to an employer unless read to penalize only conduct unacceptable in light of the common understanding and experience of those working in the industry. Ryder Truck Lines, Inc. v. Brennan, 497 F.2d 230, 233 (5th Cir. 1974). *Cf.* United States v. National Dairy Corp., 372 U.S. 29, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); United

States v. Petrillo, 332 U.S. 1, 4–8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). Of course if an employer is shown to have actual knowledge that a practice is hazardous, the problem of fair notice does not exist. But in the absence of actual knowledge, an objective test may satisfy due process. In this case, an appropriate test is whether a reasonably prudent man familiar with the circumstances of the industry would have protected against the hazard.[5] *See generally* National Realty & Construction Co. v. OSHRC, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1265 & n. 32 (1973). We would expect, most often, that reference to industry custom and practice will establish the standard of conduct. There may, however, be instances where industry practice fails to take reasonable precautions against hazards generally known in the industry; in such event it may not be unfair to hold the employer to a standard higher than that of actual practice. But in any event OSHA had to establish here that a prudent man familiar with linework would have understood that more protective equipment was "necessary" in the situation at issue.

Thus it was not enough for the administrative judge to point out that the accident could have been prevented by covering the live wire and clamp with protective rubber; that fact alone does not establish that the need for further protection would have been recognized in the industry. An employer cannot be held to guard against hazards created by employee conduct which is not reasonably foreseeable.[6] At the

---

5. The use of an objective, reasonable man test for determining compliance with the protective equipment standard has been held to be in accord with the congressional purpose as reflected in the general duty clause. McLean Trucking Co. v. OSHRC, 503 F.2d 8 (4th Cir. 1974). *See generally,* Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L. Rev. 988, 995, 1001–03 (1973), where it is argued that the proper test for a recognized hazard under the general duty clause is whether a hazard is "known" to the industry as a whole. *See* 116 Cong.Rec. 38377 (1970).

6. "Hazardous conduct is not preventable if it is so idiosyncratic and implausible in motive or means that conscientious experts, familiar with the industry, would not take it into account in prescribing a safety program."
National Realty & Construction Co. v. OSHRC, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1266 (1973).
Liability under the Act is preventive in purpose and therefore is not justified if imposed when the accident is a freak and unlikely to be repeated (though caused in fact on the occasion at issue). *See* Morey, *supra* note 5 at 1001.

hearing there was uncontroverted testimony by a safety expert in the industry that a lineman performing Thayer's task does not have to move into a dangerous position requiring more protection than was present in Thayer's case. Thayer's fellow crew members testified that Thayer had been belted below the crossarms with his feet four to six feet below the crossarms before he began his task. The expert testified that this position would be normal for one performing the task and a higher position unnecessary.[7] Although no witness could explain Thayer's probable higher position at the time of contact, the higher position is not necessarily inconsistent with the witnesses' observation of the lower position seconds earlier. It is theorized that Thayer made a sudden lunge and perhaps moved higher on the pole. While this theory is wholly speculative, no contradictory evidence explains how Thayer might otherwise have reached the position at contact in the normal or foreseeable course of his work. Without such evidence, the occurrence of the electrocution does not establish its likelihood.

▮▮▮▮▮ The administrative judge reasoned that a lineman's work on the pole inherently involved the possibility of error, slips, and unusual occurrences. While this statement seems sensible—indeed, on first impression it might even seem to a layman that Thayer's hazardous conduct might have been predictable—the judge's position is not supported in the record. No witness familiar with linework testified as to the likelihood of such error in Thayer's circumstances,[8] and the judge did not allow the expert to express his opinion as to whether contact such as Thayer's was reasonably foreseeable. In the absence of such testimony, the judge's determination as to the foreseeability of the hazard was

speculation rather than a conclusion derived from record evidence. We do not say that some gross deficiencies in protective gear could not be so glaring as to permit the administrative law judge and Commission to rule without the benefit of any testimony from safety experts familiar with, or those skilled in, the particular industry or activity. Here, however, the victim wore gloves and used other basic protective equipment. Without any support whatever from knowledgeable witnesses experienced in this technical activity, we do not see how the agency can be satisfied that the hazard was "reasonably foreseeable", or that skilled men of ordinary prudence would have thought it "necessary" for the company to impose additional protective equipment requirements upon Thayer. Moreover, we observe that the finding of a violation of the broadly worded regulation in this one situation will in effect establish an across-the-board requirement for similar activity in the industry; as a matter of sound policy, OSHA should not accept a nonobvious interpretation of the regulation without the guidance of knowledgeable sources as to the practicality and utility of the safety requirements as so interpreted.

We conclude that OSHA failed to sustain the burden, set forth in its regulations, of proving the violation. 29 C.F.R. § 220.73(a). The Act itself provides that the Commission's factual findings are conclusive "if supported by substantial evidence on the record considered as a whole". 29 U.S.C. § 660(a). We quote the Supreme Court's familiar description of this formula:

> " 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' . . . Accordingly, it

---

**7.** If Thayer had been proceeding to his task from a position above the crossarms and primary wires, protective equipment would have been necessary. According to the expert, the covering of live wires below the lineman is a normal precaution—it protects against slipping or backing into a contact.

**8.** Over OSHA's objections, lineman Fulcher testified that he did not observe anything dangerous for Thayer to do, and that Fulcher himself from the bucket "felt I could work clear and safe without covering".

'must do more than create a suspicion of the existence of the fact to be established. . . . ' "
Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951).

The record here does not support the Commission's decision under such a standard of review. None of the OSHA witnesses were qualified as experts capable of testifying as to safety precautions within industry knowledge. The OSHA regional director had some experience in electrical safety, but was no expert on lineman's work in the utility industry. Nor do we give much weight to the OSHA investigator's somewhat hedged testimony that a company official with much experience had said that the field-side wire should have been covered. The company official denied the hearsay statement, and another OSHA official could not recall any such statement while he was present.

The company's own safety rules certainly may be treated as evidence of its awareness of the hazard which caused Thayer's death. As the administrative law judge found, it was the foreman's responsibility to insist on safety requirements, and a company rule states quite strongly that the "workman" shall protect himself:

> "A sufficient amount of protective equipment must be used to prevent accidental contact of any part of the body with the conductors or parts . . .. In cases where work is actually being done close to live wires or live apparatus, where the voltage is greater than 600, rubber gloves must be worn and, in addition, other live parts must be covered with rubber blankets, hose or hoods, so that parts of the body other than the hands cannot come into contact with the live parts."

For the following reasons, however, we do not consider the company's rule evidence enough to establish a failure on the company's part to follow reasonably prudent practices.

The rule is not specific. Other than requiring the use of gloves, which Thayer was wearing, it sets up a general requirement that "sufficient" protective covering be used "where work is actually being done close to live wires". The fact that Thayer must reach within six inches of the uncovered wire did not in itself establish that he was "close" since, according to expert testimony, the lineman is "close" to the uncovered wire only in the sense that his outstretched hand with a fourteen-inch protective glove is that near. Since the accident did occur, the protective equipment used must not have been "sufficient".[9] But we are unwilling to uphold the Commission's decision solely on the basis of the apparent violation of a rule phrased so broadly that if it were followed literally by the company's employees, all chance of electrocution would be eliminated. We also fear that turning a very general rule of this sort against the company would needlessly discourage an employer from exhorting employees to take every possible safety precaution.[10]

That Thayer had only 12 days experience as a first-class lineman provides little support for the conclusion that more protective equipment should have been provided by the company in his case. The company's linemen go through a training process and must have experi-

---

**9.** There was undisputed testimony that ample additional protective rubber was available in the crew's truck, and so the possibility does not arise that the crew members were trying to explain away the absence of such equipment on the field-side primary wire by saying it was not needed.

**10.** *See* Morey, *supra* note 5, at 1002:
"Recognizing the disincentive [in holding an employer to a higher standard than the rest of the industry] toward the obviously commendable development of a superior industrial safety program, I hasten to add that specific, confirmed knowledge should be required, not a mere suspicion or theory that there is a hazard. And the allowance of adequate time to correct the hazard is of particular importance in this situation."

ence before they are eligible to be first-class linemen. Thayer had in fact been an acting first-class lineman during the three months before his promotion. There is no evidence that he or any other company lineman lacked sufficient training, dexterity, or judgment to have done the work safely or to be left with the decision whether to cover the side primary wires. The expert's testimony, again undisputed, was that in some circumstances the man on the pole might more appropriately make the decision than could a foreman from his angle on the ground.

While neither the foreman nor Thayer's buddy was watching at the time of contact, the testimony of all on the scene was that both men were present and generally following Thayer's actions. There is nothing in the record indicating that prudence would require a supervisor or buddy constantly to watch the employee on the pole, or that any such practice would be feasible. Further, the company was not charged with negligent lack of supervision or of any other violation of the general duty clause, but rather with failure to comply with the protective equipment standard.

In the absence of evidence from those qualified to express such an opinion that further protective equipment was necessary and should have been required on the field-side primary wires and clamps, we hold that the Commission's finding of a violation of the safety standard was not supported by substantial evidence.

We recognize that those most familiar with electrical line work are likely to be actively employed by private companies. But OSHA is surely not without access to qualified witnesses. It is also possible that the level of industrial safety practices may be so inadequate as to fall below desirable standards. But we do not require reference solely to company-sponsored practices. We refer rather to the standard of safety that could be expected from a reasonably prudent man familiar with the circumstances of the industry. And in the unlikely event that the Commission should be stymied in

making out cases of this nature because of difficulties of proof or for other reasons, the Secretary of Labor may exercise the option of promulgating specific standards of his own governing electrical line workers.

The decision and order of the Occupational Safety and Health Review Commission are reversed.