## Green Mountain Power Corp. v. Commissioner of Labor and Industry

[383 A.2d 1046]

No. 60-77

Present: Barney, C.J., Daley, Larrow and Billings, JJ. and Smith, J. (Ret.), Specially Assigned

Opinion Filed February 7, 1978

16

*Paul D. Sheehey,* Burlington, for Plaintiff.

*M. Jerome Diamond,* Attorney General, and *James S. Suskin,* Assistant Attorney General, for Defendant.

**Larrow, J.** This appeal involves construction of the "general duty clause" of Vermont's Occupational Safety and Health Act (VOSHA). 21 V.S.A. §§ 201–231.

### Proceedings Below

Steven Bagalio, a lineman first class A for Green Mountain Power Corporation (GMP), was killed when, in an attempt to remove a "jumper," he came into contact with a live wire. The day following the accident an inspector from the Department of Labor and Industry conducted an inspection of the work site and, as a result, the Department issued a "serious citation" to GMP under § 210(a)(2) and (b), claiming a violation of VOSHA's general duty clause. 21 V.S.A. § 223(a). In addition, a $600.00 penalty was proposed by the Department for violation of that clause.

GMP contested the citation and proposed penalty pursuant to § 226(a), and the Commissioner of Labor and Industry filed a complaint with the Occupational Safety and Health Review Board. After full evidentiary hearing under § 226(d), the Review Board issued findings of fact and a decision which upheld the citation and penalty. It concluded GMP failed under § 223(a) to provide Bagalio with a place of employment which was free from a recognized hazard that was likely to cause death or significant physical harm in that adequate protective covering was not used on energized wires in the area where he was performing his work.

GMP appealed the Review Board's findings of fact and decision to the Chittenden Superior Court under the provisions of § 227(a). The superior court, acting as an intermediate

appellate court, confirmed the findings of the Review Board *in toto*, but reversed the Board's decision, holding the record did not support the conclusion of a violation of VOSHA. The court reasoned that an uncovered energized line is not a "recognized" hazard for purposes of the general duty clause; rather, the employee's failure to obey the company rule requiring covering of lines within reach constituted the hazard. The court concluded the hazard was an isolated incident of employee misconduct, which was beyond the employer's control and for which the employer could not be held liable under VOSHA.

The Commissioner of Labor and Industry now seeks review of the judgment of the superior court reversing the Review Board's decision. Finding that the superior court's judgment is erroneous and rests on an incorrect construction of § 223 (a), we vacate the court's order and reinstate the Review Board's determination.

## Facts

The findings of the Review Board, which were adopted in their entirety by the superior court and which are largely undisputed, may be summarized. At the time of the accident, Bagalio was one of a crew of five GMP employees, including three linemen first class A, one groundman and a working foreman. The crew, which had begun work at the job site five days before the fatal accident, was engaged in reconductoring (replacing) sections of copper lines with aluminum lines on five poles in a series running approximately 300 feet in length. It is the practice of GMP and of the industry to perform reconductoring work on energized lines to avoid prolonged interruptions of service. Temporary connections are made to the new lines to maintain service, and as permanent connections are made the temporary connections or "jumpers" (short sections of flexible insulated conductor) are removed and the old lines are cut down. Bagalio was working on one pole with another lineman and then descended that pole to climb Pole No. 3 in order to remove a jumper which had been in use on that pole. Before ascending Pole No. 3, Bagalio told the foreman what he intended to do. The foreman took no action except to admonish Bagalio that he should do nothing further without assistance after removing the jumper. With the fore-

man's authorization, Bagalio proceeded to climb Pole No. 3 and remove the jumper. At that time all three of the linemen were on separate poles, and the foreman was on the ground. Although no one saw Bagalio again before the accident, the Review Board concluded that, after climbing the pole, he "belted in" between the lower cross arm braces, detached one end of the jumper, shifted his body one-quarter of the way around the pole, and pulled the detached end of the jumper over the upper cross arm. In the process of removing the remainder of the jumper, Bagalio leaned backward and the back of his neck made contact with an uncovered wire, resulting in his instantaneous electrocution. There was additional protective equipment situated in the crew's truck at the time.

Bagalio had worked for GMP for over six years, progressing from an apprentice lineman to a lineman first class A. At the time of the accident he was an experienced, able lineman, physically fit and mentally competent for the work of a lineman, and he had given his employer no reason to believe he would not comply with its safety standards. GMP has a continuing safety program that is conducted by an experienced safety supervisor. The safety program consists of meeting at least monthly, distribution of bulletins and literature, and periodic inspection of job sites followed by written reports to supervisors, warnings and disciplinary measures. It was described by the VOSHA compliance inspector as meriting full credit.

GMP's safety policy with respect to the use of rubber cover on conductors during work on poles is to cover whatever is within reach of the lineman. This is a reasonable policy and one generally adopted in the industry. It is also GMP's policy that all safety determinations regarding protective covering are to be made by the lineman first class, even when he is under the immediate supervision of a foreman. At the time of the accident there was insufficient protective covering on Pole No. 3 to minimize the hazard encountered by Bagalio in removing the jumper without assistance, and the foreman on the job was aware of this fact.

The Commissioner agrees with all of the Review Board's findings, but urges reversal of the superior court's judgment,

claiming Bagalio's failure to comply with the company's safety policy of covering everything within reach should not be a defense under VOSHA. He contends that GMP's policy of leaving all decisions regarding the covering of wires to the lineman first class runs counter to the very purpose of VOSHA. And he argues vigorously that to allow an employer to shift the burden of safety responsibility to its employees when they are working directly under management is tantamount to absolving employers of any responsibility for providing the safe workplace contemplated by the Legislature.

GMP, on the other hand, claims that failure to recognize employee noncompliance with established company safety policies as a defense is tantamount to imposing an absolute duty on employers to insure the safety of its employees, a duty which is not contemplated under VOSHA. Although GMP contends the superior court's judgment is supportable under the facts as found by the Review Board, it claims that findings 38 and 39 are erroneous in that they are unsupported by the evidence.

### Contested Findings

The standard of appellate review in VOSHA cases is expressly set out in the Act itself:

> The findings of the review board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. [21 V.S.A. § 227(a)].

The somewhat imprecise "substantial evidence" standard has received elucidation in several United States Supreme Court cases. " '[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . [It] must do more than create a suspicion of the existence of the fact to be established. . . . it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' " *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). It differs little, if at all, from the "clearly erroneous" test of V.R.C.P. 52(a). See *Seaway Shopping Center Corp. v. The Grand Union Stores, Inc.*, 132 Vt. 111, 117, 315 A.2d 483

(1974). With that standard and its definition in mind, we proceed to appellee's claim that findings 38 and 39 are unsupported by the evidence.

■ Finding 38 states: "The foreman on the job was aware of the fact that the pole did not have sufficient protective covering to permit an employee to remove the jumper without assistance." It is clear from the record that the foreman was aware of the fact that the pole did not have sufficient protective covering to permit an employee to remove the entire jumper, *i.e.* both ends of the jumper. It is equally clear, however, that the foreman felt there was adequate protective covering to de-energize the old wire, *i.e.* to remove only one end of the jumper. By "remove the jumper" did the Review Board mean removal of both ends of the jumper or removal of one end of the jumper? The Court is of the view that the plain and ordinary meaning of finding 38 is that the foreman was aware of the fact that the pole did not have sufficient protective covering to permit an employee to remove the jumper in its entirety without assistance. This construction is buttressed by the fact that the Review Board coupled the words "remove the jumper" with the words "without assistance," since there was considerable testimony to the effect that the foreman felt Bagalio could not have removed both ends of the jumper safely without assistance. Read as such, finding 38 is amply "supported by substantial evidence on the record considered as a whole."

■ Finding 39 reads as follows: "The respondent's safety policy on the job site is that all safety determinations in reference to protective covering are to be made by the first class lineman even when such lineman is under the immediate supervision of a foreman." A careful review of the record reveals no error as to this finding. GMP's chief safety officer, in response to the question of who has responsibility for determining which wires should be covered, testified that, "The employee himself has, when he reaches a first class lineman's level, this responsibility." And the foreman on the job site at the time of the accident, responding to the question of whether it was Bagalio's responsibility to carry out the company safety policy of covering all wires, testified, "It was his responsibility to

cover everything, he should have, yes." Although the business manager for the local electrical workers union testified that he felt there is a joint responsibility between the foreman and the lineman for covering wires, the testimony of GMP's chief safety officer and foreman, who presumably are in a better position to know the company's safety policy, is more than adequate to support finding 39.

### Legislative Background

In 1970, Congress enacted the Occupational Safety and Health Act (OSHA) "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. §§ 651–678. To accomplish these purposes, Congress established dual employer duties under OSHA. First, Congress conferred upon the Secretary of Labor authority to establish specific standards for safe and healthful conditions of employment. 29 U.S.C. § 655. Each covered employer has the duty of complying with all safety and health standards promulgated by the Secretary which are applicable to the employer's place of employment. 29 U.S.C. § 654(a)(2). These specific standards are intended to be the primary method of achieving OSHA's objectives. See 116 Cong. Rec. 38371 (1970). Second, in all cases not covered by such specific standards, the employer has a duty to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). This "general duty clause" was incorporated into OSHA in recognition of the fact that there will be a wide variety of hazardous employment situations which fall outside the scope of the specific standards. The comprehensive general duty requirement was included in OSHA to cover these cases.

Since the purpose of OSHA is not to compensate injured employees, but rather to prevent injuries, the Act establishes a schedule of various penalties. 29 U.S.C. §§ 653(b)(4), 666. In keeping with the preventative nature of the Act, a violation of the Act is based upon the mere existence of unsafe or un-

healthy working conditions, and actual injury, although relevant, is not conclusive as to the fact of violation.

It is clear from the Act that Congress intended the states to have a major role in occupational safety and health matters. Nothing in the Act prevents any state from asserting jurisdiction, under state law, over any occupational safety or health issue with respect to which no federal standard is in effect. 29 U.S.C. § 667(a). And a state may preempt applicable federal standards by submitting an acceptable state plan for the development and enforcement of state standards. 29 U.S.C. § 667(b). The approval of a state plan by the Secretary of Labor is conditioned upon the state meeting several requirements which are designed to assure that the state plan is or will be as effective as the federal program. 29 U.S.C. § 667(c). The Secretary of Labor approved Vermont's plan on October 1, 1973; the plan was declared "operational" as of February 19, 1975.

The Vermont plan (VOSHA) is patterned after the federal act. VOSHA adopts as state standards all federal standards applicable to employment in the state. 21 V.S.A. § 201(c)(2). And, as with OSHA, employers have dual duties under VOSHA. Each employer has a duty to comply with specific standards promulgated, and a general duty to furnish his employees with a place of employment that is "free from recognized hazards that are causing or are likely to cause death or significant physical harm to his employees." 21 V.S.A. § 223(a). VOSHA's general duty clause is nearly identical to the federal general duty clause, the only difference being OSHA's requirement of "serious" physical harm, in contrast to VOSHA's requirement of "significant" physical harm. In addition, both the federal and state acts impose on each employee a duty to comply with the safety and health standards of the respective acts, although no penalties or other enforcement mechanisms are provided for employee violations under either act. 29 U.S.C. § 654(b); 21 V.S.A. § 223(b).

### General Duty Clause

Neither the general duty clause nor any other aspect of VOSHA has been construed by this Court to date. However, several federal circuit courts of appeals have interpreted

OSHA and, in particular, OSHA's general duty clause. Although not binding upon us, we find these federal appellate court decisions instructive in light of the genesis of VOSHA and the substantial similarity between the two acts.

█ In order to sustain a general duty clause violation, the Commissioner must establish that the employer (1) failed to render his place of employment "free" of a hazard that was (2) "recognized" and (3) "causing or likely to cause death or significant physical harm." The "hazard" under consideration here is the obviously dangerous activity of working with and around high voltage energized electrical wires without adequate protective cover. Since the parties agree that there was inadequate protective cover on the pole for the protection of Bagalio, there is no question that there is a "hazard" in this case.

There is also no dispute that such a hazard is "likely to cause death or significant physical harm." Although no injury whatsoever is necessary to establish a causal nexus between the hazard and the likelihood of death or significant physical harm, Bagalio's instantaneous electrocution in this case is demonstrative of the potentiality for serious physical harm while working near energized wires without adequate protective covering.

█ Is this hazard which is likely to cause death or significant physical harm a "recognized" hazard? The federal courts have given this term various interpretations. It has been held that a hazard is "recognized" if the employer has actual knowledge of the hazard. *Brennan* v. *OSHRC* (*Vy Lactos Laboratories, Inc.*), 494 F.2d 460, 464 (8th Cir. 1974). It also has been stated that a hazard is "recognized" if the hazard is known to the industry as a whole, even though the employer is unaware of the activity's potentiality for harm. *National Realty & Construction Co.* v. *OSHRC*, 489 F.2d 1257, 1265 n.32 (D.C. Cir. 1973); See *Brennan* v. *OSHRC* (*Hanovia Lamp Division*), 502 F.2d 946 (3d Cir. 1974). And the First Circuit has suggested that an appropriate test for establishing a recognized hazard would be whether a "reasonably prudent man familiar with the circumstances of the industry would have protected against the hazard." *Cape & Vineyard Division*

v. *OSHRC*, 512 F.2d 1148, 1152 (1st Cir. 1975). We need not adopt any one interpretation, however, because the evidence here is sufficient to establish a "recognized hazard" under any construction of the term. The evidence below clearly established that both GMP and the industry in general took the hazard in question seriously enough to formulate a specific safety rule of covering all wires within reach of a working employee. These safety rules certainly show their awareness of the hazard. Cf. *Cape & Vineyard Division* v. *OSHRC*, 512 F.2d 1148, 1154 (1st Cir. 1975). Indeed, even though the lower court held that "an uncovered energized line is not a 'recognized' hazard," GMP does not seem to dispute the Commissioner's contention on appeal that working near energized wires without adequate protective cover is a recognized hazard within the meaning of the general duty clause.

The primary issue then is whether GMP furnished its employee a place of employment which was "free" of the recognized hazard. It is undisputed that GMP has a good over-all safety program. The company's safety policy of covering all wires within reach of a lineman is a reasonable policy and one generally adopted in the industry. But it is also GMP's policy that all safety determinations with regard to protective covering are to be made by the lineman first class, even when he is under the immediate supervision of a foreman. Did GMP make its workplace "free" of the recognized hazard by issuing adequate safety instructions, or was GMP also under an affirmative duty to see to it that those instructions were implemented?

██ Though a literal reading might suggest otherwise, the general duty clause does not impose an absolute duty on employers to render their workplaces free of recognized hazards. Two factors militate against a standard of absolute liability. First, the preventative and deterrent nature of VOSHA indicates the duty is to be an achievable one. VOSHA is intended to force employers to take action against preventable injuries and deaths. See 21 V.S.A. § 210(a)(4). Compare *General Meat Co.*, 1971–1973 Occ. S. & H. Dec. (CCH) ¶ 15,098 (June 20, 1972) with 21 V.S.A. § 201(c). Its purpose is not to compensate injured employees, and it does not affect

workmen's compensation laws in any manner. 21 V.S.A. § 222(a)(2). The penalties that may be imposed under the Act, which are collected by the state, exist to deter violations of the Act and to compel abatement or correction of hazardous conditions or activities. A hazard consisting of unforeseen employee misconduct cannot be completely eliminated. "A demented, suicidal, or willfully reckless employee may on occasion circumvent the best conceived and most vigorously enforced safety regime." *National Realty & Construction Co. v. OSHRC*, 489 F.2d 1257, 1266 (D.C. Cir. 1973); see *Brennan v. OSHRC (Hanovia Lamp Division)*, 502 F.2d 946, 951 (3d Cir. 1974) (no strict liability for the results of "idiosyncratic, demented, or perhaps suicidal self-exposure of employees to recognized hazards"). When such a hazard is unpreventable the employer, of course, cannot correct or abate it. It follows, we think, that the Act does not make an employer the guarantor of employee compliance with the Act's provisions. Secondly, the avowed legislative occupational policies underlying VOSHA do not accord with a finding of an absolute duty. The declared policies of the state are twofold: (1) "that *insofar as practicable* no employee shall suffer diminished health, functional capacity or life expectancy as a result of his work experience," and (2) "that practices and procedures prescribed by an employer for performance of work or duties by his employees shall not be *insofar as practicable*, dangerous to the life, body or well being of the employees." 21 V.S.A. § 201(a)–(b) (emphasis added); see 21 V.S.A. § 202. Compare 21 V.S.A. § 201(c)(3) with 29 U.S.C. § 651 (b). The proviso "insofar as practicable" evinces a legislative intent that the duty imposed by the general duty clause be an achievable one; a standard of absolute liability is not contemplated. See *National Realty & Construction Co. v. OSHRC*, *supra*, 489 F.2d at 1266 n.35; accord, *Horne Plumbing & Heating Co. v. OSHRC*, 528 F.2d 564, 570–71 (5th Cir. 1976); *Cape & Vineyard Division v. OSHRC*, 512 F.2d 1148, 1152 (1st Cir. 1975); *Brennan v. OSHRC (Alsea Lumber Co.)*, 511 F.2d 1139, 1144–45 (9th Cir. 1975); *Brennan v. OSHRC (Hanovia Lamp Division)*, 502 F.2d 946, 951 (3d Cir. 1974); *REA Express, Inc. v. Brennan*, 495 F.2d 822, 826 (2d Cir. 1974).

■ Nothing in VOSHA, on the other hand, is intended to relieve the employer of his general responsibility of obtaining employee compliance with the Act's requirements. Primary responsibility for achieving a safe and healthful workplace rests with the employer under the Act. The general duty clause imposes upon the employer a statutory duty to attempt to prevent and suppress hazardous conduct by employees, and this duty is not qualified by the doctrines of assumption of risk, contributory negligence, comparative negligence, or the fellow servant rule. Many, if not most, occupational injuries arise from varying degrees of employee negligence—this is why primary responsibility for compliance with the requirements of the Act remains with the employer. *National Realty & Construction Co.* v. *OSHRC, supra,* 489 F.2d at 1266 n.36.

■ A recognized hazard is preventable if "demonstrably feasible measures" taken by the employer would materially reduce the likelihood of the existence of the hazard. *National Realty & Construction Co.* v. *OSHRC, supra,* 489 F.2d at 1267; see *Horne Plumbing & Heating Co.* v. *OSHRC, supra,* 528 F.2d at 569; *Brennan* v. *OSHRC (Hanovia Lamp Division), supra,* 502 F.2d at 952. Where the employer could not have taken additional feasible steps to avoid noncompliance with the Act's requirements by his employee, there is no basis for imposing liability under the Act.

■ Under the particular facts of this case, we hold that GMP did not discharge its statutory obligation by simply issuing adequate safety instructions and holding safety meetings. Delegating the responsibility of implementing the company's safety policies to rank and file employees, while under the immediate supervision of managerial personnel, does not comport with either the letter or the spirit of VOSHA. To hold otherwise would mean that once an employer provides its employees with safety equipment and issues orders or instructions regarding the safe use of that equipment, the employer is free to disregard the employee's actual compliance with those instructions. To say the company invokes disciplinary measures for noncompliance with its safety rules is not enough. Although such after-the-fact measures are within the intendment of the Act, actual supervision during the perform-

ance of a job, where feasible, also is intended. We do not hold that the employer must provide constant over-the-shoulder or one-to-one supervision for his employees. Such a duty would be impracticable, unfeasible, and unreasonable. Where, however, as here, a supervisor is present on the job site, has knowledge of the job, and is aware of a particular hazard that poses a high likelihood of serious injury in the absence of precautionary measures, an employer cannot rely on a company policy that provides that the employee should make his own determination of the need for protective cover. Such a policy may, of course, meet the mandate of VOSHA in certain situations, such as where a lineman first class must, by necessity, work alone. This is not the case here, however. Nor are we faced with the factual situation where an employee disobeys a direct order. The foreman, who was aware of the fact that there was inadequate protective cover around Pole No. 3, could easily have directed Bagalio to install additional protective cover.

*The judgment of the Chittenden Superior Court is reversed and vacated, and the determination of the Occupational Safety and Health Review Board is reinstated.*