COTTER & COMPANY, Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray Marshall, Secretary of Labor, Respondents.

No. 77–3312.

United States Court of Appeals, Fifth Circuit.

July 10, 1979.

Joseph Szczecko, Decatur, Ga., for petitioner.

Eric W. Cloud, Atty., Dept. of Labor, Allen H. Sachsel, U.S. Dept. of Justice, Washington, D.C., for respondents.

Before THORNBERRY, GODBOLD and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

In this case we must determine whether substantial evidence supports a decision by the Occupational Safety and Health Review Commission (Commission) that Cotter & Company (Cotter) violated 29 C.F.R. § 1910.132(a)[1] by permitting its employees to work without appropriate personal protective equipment for the feet while exposed to possible foot injuries. We reverse the Commission's assessment of a nonserious violation because there is not substantial evidence in the record to support a finding that a reasonably prudent employer in the warehousing and distribution industry would have understood that the use of steel-toed shoes, or equivalent safety-toed shoes, was mandated by the conditions on Cotter's shipping and receiving docks at the inspected worksite. Neither is there substantial evidence to support a finding that Cotter had actual knowledge of hazardous conditions requiring the use of steel-toed shoes.[2]

Cotter is a hardware wholesaler that supplies merchandise exclusively to True-Value Hardware Stores. Cotter has warehousing and distribution facilities in eleven states. The alleged violation in this case occurred at Cotter's Jonesboro, Georgia, facility, which was inspected on August 5, 1976, by two OSHA compliance officers.

Twenty-five employees work on the shipping and receiving docks at the Jonesboro facility. Packages are moved manually and on hand trucks and forklifts. The average weight of each carton loaded and unloaded manually is approximately fifteen pounds, and the heaviest item handled manually weighs approximately forty pounds. Heavier articles which can weigh up to 260 pounds are moved by forklifts or other mechanical equipment.

Cotter requires its employees to wear "only shoes that fully cover and protect the feet" when on duty and prohibits open-toed shoes, sandals, tennis shoes, gym shoes, or bare feet on the job. Cotter does not require its employees to wear steel-toed shoes, also known as safety-toed shoes, although it does have a program in its plant through which employees who wish to do so can buy steel-toed shoes. About half of the employees have purchased steel-toed shoes through this program.

In the previous two years, Cotter's shipping and receiving personnel had suffered only three injuries which involved a foot or toe. Two of these injuries would not have been mitigated or prevented by wearing steel-toed shoes. The third occurred as the result of one employee's tossing a carton to another, an act which is specifically forbidden by Cotter's safety policy and for which the employees were reprimanded.

The OSHA compliance officers noticed during their August 5, 1976, inspection that some shipping and receiving employees did not wear steel-toed shoes. As a result of the inspection of Cotter's Jonesboro facility,

---

1. The standard established by the regulation provides as follows:

Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encoun-

tered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact.

2. Had substantial evidence on the record considered as a whole supported the Commission's findings of fact, those findings would be conclusive on our review of the case. 29 U.S.C.A. § 660(a).

the Secretary of Labor issued a citation to Cotter for a nonserious violation of 29 C.F.R. § 1910.132(a) for not requiring its employees exposed to possible foot injuries on the shipping and receiving dock to wear appropriate protective footwear. A $30.00 penalty was proposed and the violation ordered abated by September 13, 1976. Cotter timely contested the citation and proposed penalty and, after a hearing, the administrative law judge (ALJ) affirmed the citation but assessed no penalty. The Commissioner timely directed review by the Commission and the Commission subsequently affirmed the ALJ's decision. 29 U.S.C.A. § 661(i). Cotter, pursuant to 29 U.S.C.A. § 660(a), petitioned for review of the Commission's final order. This Court has jurisdiction under 29 U.S.C.A. § 660(a).

The ALJ and the Commission upheld their decisions that Cotter had violated 29 C.F.R. § 1910.132(a) by finding that Cotter had actual knowledge of the hazard of toe injuries to its shipping and receiving employees. In reaching their decisions, both the ALJ and the Commission recognized that the evidence shows it is not the custom or practice in the warehousing and distribution industries for employers to require their shipping and receiving employees to wear steel-toed shoes. They found this consideration to be overridden by their finding that Cotter had actual knowledge of the hazard.

Since the Commission's decision, this Circuit has twice held that industry custom and practice will generally establish the conduct of the reasonably prudent employer for the purpose of interpolating specific duties from general OSHA regulations. *Power Plant Division, Brown & Root, Inc. v. OSHRC,* 590 F.2d 1363, 1365 (5th Cir. 1979); *B & B Insulation, Inc. v. OSHRC,* 583 F.2d 1364, 1370–71 (5th Cir. 1978).[3]

In *B & B Insulation* and *Power Plant* we considered the application of a different OSHA regulation, 29 C.F.R. § 1926.28(a), to employers' conduct, but our reasoning in these cases is apropos here since § 1910.-132(a) and § 1926.28(a) have been recognized as analogous general federal admonitions. *B & B Insulation,* 583 F.2d at 1366, 1369. Our conclusions in *B & B Insulation* bear repeating:

Where the reasonable man is used to interpolate specific duties from general OSHA regulations, the character and purposes of the Act suggest a closer identification between the projected behavior of the reasonable man and the customary practice of employers in the industry. The purpose of the Act is preventive rather than compensatory. Achievement of its goal of reducing industrial accidents depends upon employer compliance through elimination of legislatively identified safety and health hazards by prescribed remedial measures. Preventive goals are obviously not advanced where broad standards are extended to encompass every situation which gives rise to an unlikely accident.

The Act indicates that Congress thought specificity of standards desirable. In light of the Acts preventive purpose and the intended specificity of its standards, the employer whose activity is not yet addressed by a specific regulation and whose conduct conforms to the common practice of those similarly situated in his industry should generally not bear an extra burden.

Where the Government seeks to encourage a higher standard of safety performance from the industry than customary industry practices exhibit, the proper recourse is to the standard-making machinery provided in the Act, selective enforcement of general standards being inappropriate to achieve such a purpose. The use of standard-making procedures assures that not only would employers be

---

3. We have previously recognized 29 C.F.R. § 1910.132(a) as an imprecise, albeit constitutional, regulation drafted "in light of the myriad conceivable situations which could arise and which would be capable of causing injury." The "reasonable man" test is necessarily inherent in the standard set by the regulation so that its application to varied but particular proscribed conduct may be reasonably anticipated. *Ryder Truck Lines, Inc. v. Brennan,* 497 F.2d 230, 233 (5th Cir. 1974).

apprised of the conduct required of them and responsibility for upgrading the safety of the industry would be borne equally by all its members, but the resulting standard would benefit from input of the industry's experts, both employer and employee, cost and technology obstacles faced by the industry could be weighed, and more interested parties can participate in the process.

Id. at 1370–72 (footnotes omitted).

In this case, the Commission found that employers in the warehousing and distribution business would not have required their shipping and receiving employees to wear steel-toed shoes. The evidence to that effect amply supports their finding; indeed, there is no evidence to the contrary.[4] Here, as in B & B Insulation, "the Commission would assert the authority to decide what a reasonable prudent employer would do under particular circumstances, even though in an industry of multiple employers, not one of them would have followed that course of action." Id. at 1370. Here, as in B & B Insulation, the Commission's disregard of demonstrated industry custom is improper.[5]

■ There is one additional consideration in this case, however, that we were confronted with in neither B & B Insulation nor Power Plant. Here the Commission found that Cotter had actual knowledge of a hazard so that the industry custom and practice was irrelevant in terms of establishing notice of a hazard and the concomitant responsibility to afford protection from that hazard. As we noted earlier, § 1910.-132(a) is construed as containing the "reasonable man" test, for otherwise the mandate would not afford a reasonable warning of the proscribed conduct and would not meet constitutional standards. See Ryder Truck Lines, Inc. v. Brennan, 497 F.2d at 233. Where "an employer is shown to have actual knowledge that a practice is hazardous, the problem of fair notice does not exist." Cape & Vineyard Division of the New Bedford Gas and Edison Light Co. v. OSHRC, 512 F.2d 1148, 1152 (1st Cir. 1975). Hence, we must determine whether there is substantial evidence on the record considered as a whole to support the Commission's finding regarding Cotter's actual knowledge of a hazard warranting the required use of steel-toed shoes. See 29 U.S.C.A. § 660(a).

■ Our review of the record reveals an inadequate evidentiary basis for the finding of actual knowledge of the need for steel-toed shoes. As related earlier, only one injury in the previous two years would have been prevented or mitigated by steel-toed shoes. Moreover, that injury resulted from employee conduct which was specifically prohibited by company rules and for which the employees were reprimanded. We noted in Ryder Truck Lines that where an employee's conduct is willfully reckless, the employer cannot reasonably be expected to prevent the existence of the hazard which the reckless behavior creates. 497 F.2d at 234. Three witnesses offered by Cotter, all employees of the Company who were involved in some fashion in the company's maintenance of safe working conditions, emphatically rejected the notion that Cotter was aware of a hazard warranting the required use of steel-toed shoes. They also testified that the program through which

4. This record is clear regarding the customary practice in the employer's industry, whereas the record in Power Plant provided few clues to the customary practice in that employer's industry. We may thus reverse the Commission's finding in this case, although we were constrained to remand Power Plant to the Commission for further fact-finding proceedings. See Power Plant, 590 F.2d at 1365.

5. We note that custom is not dispositive in negligence actions, even absent actual knowledge, for "what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & Pacific Ry. Co. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903). There is, however, no compelling evidence presented on this record to the effect that steel-toed shoes ought to be required on shipping and receiving docks in the warehousing and distribution industry. Such a determination, absent clear and uncontradicted proof, is best left to the standard-making machinery provided in the Act. See B & B Insulation, 583 F.2d at 1370–72.

employees could buy steel-toed shoes was established merely to accommodate the preferences of the employees rather than to reflect the knowledge of the employer that the shoes were necessary precautions. We recognize, as did the First Circuit in *Cape and Vineyard*, 512 F.2d at 1154, the folly of discouraging an employer, by expanding the scope of his liability beyond what it would otherwise be, from exhorting employees to take every possible safety precaution in the development of a superior industrial safety program. In short, we find no evidence in the record of a specific, confirmed knowledge on Cotter's part regarding a hazard warranting a steel-toed shoe requirement.

Because the Commission's decision is not supported by substantial evidence on the record as a whole, the assessment of a non-serious violation against Cotter is

REVERSED.