659 F.2d 1285
 10 O.S.H. Cas.(BNA) 1070, 1981 O.S.H.D. (CCH)
P 25,744
 OWENS-CORNING FIBERGLASS CORPORATION, Petitioner,
v.
Raymond J. DONOVAN, Secretary of Labor, U. S. Department of
Labor, and the Occupational Safety and Health
Review Commission, Respondents.
 No. 79-2516.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B*
 Oct. 26, 1981.
 Pope, Ballard, Shepard & Fowle, Charles M. Chadd, Charles R. McKirdy, Chicago, Ill., for petitioner.
 Ann D. Nachbar, Allen H. Feldman, U. S. Dept. of Labor, Washington, D. C., for respondents.
 Petition for Review of An Order of the Occupational Safety and Health Review Commission.
 Before GODBOLD, Chief Judge, TUTTLE and HILL, Circuit Judges.
 GODBOLD, Chief Judge:
 
 
 1
 Owens-Corning Fiberglass Corp. (OCF) petitions this court under 29 U.S.C. § 660(a) to review an order of the Occupational Safety and Health Review Commission (OSHRC) affirming the order of an Administrative Law Judge (ALJ) finding OCF in non-serious violation of the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. The ALJ determined that OCF violated 29 C.F.R. § 1910.132(a)[1] by failing to require its employees to wear gloves when their work requires them to come into contact with fiberglass or presents a risk of contact with "hot glass." We find substantial evidence in the record to support the ALJ's conclusion that OCF had actual knowledge that its employees were exposed to a hazard requiring the use of personal protective equipment (gloves), and, therefore, affirm the order of the Commission.
 
 I. FACTS
 
 2
 OCF manufactures fiberglass insulation at its plant in Fairburn, Georgia. The first step in the process spins molten glass into fibers, which are then cured in an oven, cooled, and affixed to a paper backing. After the product is cut to size it is conveyed to a packing area. Two different types of packing operations are used. Shorter lengths of material ("batts") are sent to the bagging area where employees manually lift, fold, and stack them. The stacks are then mechanically bagged and sent to a warehouse. Longer lengths are ordinarily not bagged but are mechanically formed into rolls on a machine called the "dyken," then manually taped and unloaded by an employee. Employees in both the bagging and dyken areas use their hands to lift and carry fiberglass bundles.
 
 
 3
 Occasionally, because of malfunctions in the machine that forms glass into fibers, a length of fiberglass material may contain an unfiberized agglomeration of glass known as a "hot spot." Hot spots range from about the size of a BB to about the size of a fist and average about the size of a half dollar. Usually the presence of a hot spot is announced over the plant's public address system so that operators can prevent them from causing jams in the cooling or cutting sections, but sometimes a hot spot will reach the bagging and dyken areas without being detected. Hot spots occur at irregular intervals from two or three minutes to a day or two apart. Although the record does not establish the temperature of the hot spots, employees in the bagging and dyken areas testified that they have seen paper backing smoldering from the heat and reported having felt the heat of hot spots through gloves.
 
 
 4
 Unprotected skin contact with fiberglass often causes a skin irritation called "fiberglass itch," a kind of rash accompanied by moderate to severe itching. Continued exposure to fiberglass over a period of a few days to a few weeks, however, usually results in a phenomenon known as "hardening," whereby the skin stops reacting to the irritant.[2] Hardening depends upon continuous exposure. An employee who goes on vacation loses his resistance to fiberglass itch and must, if not protected from contact, suffer the itch until his skin hardens once more.
 
 
 5
 OCF has for some time provided leatherette gloves to its employees who desire to wear them, but it has never required the use of gloves. A pair of gloves ordinarily lasts about two work weeks before wearing out. OCF admits that during the months immediately preceding the OSHA inspection its glove program had become "lax," with the company failing to provide gloves as often as its employees desired. There was evidence that supervisors had on occasion refused to provide replacements for gloves that had become worn beyond the point of being usable, and at least one employee filed a grievance with his union concerning the provision of gloves. OCF's plant manager estimated that between 20 and 40 per cent of OCF's employees prefer not to wear gloves but admitted that this was only "a rough guess" and that it "could be way off." (Transcript at 201, 203.)
 
 
 6
 In response to a complaint, an OSHA compliance officer inspected OCF's plant on September 28 and October 8, 1976. As a result of this inspection the Secretary of Labor issued a citation for violation of § 1910.132(a) by failing to require employees in the bagging and dyken areas to wear gloves to protect their hands from irritation and fiberglass itch and from the risk of being burned by hot spots.[3] OCF filed a timely notice of contest. The ALJ found that gloves were necessary to protect employees from the risk of being burned by hot spots and that it was unnecessary to determine whether gloves were also required to protect employees' hands from irritation. On discretionary review the OSHRC affirmed but modified the ALJ's findings by adding a finding that gloves are required for protection from both hot spots and irritation. OCF then filed the instant petition for review.
 
 II. DISCUSSION
 
 7
 OCF argues that it could not be found in violation of § 1910.132(a) because it is not the custom and practice in the fiberglass industry to require employees to wear gloves to protect their hands from hot spots and fiberglass itch and because OCF had no actual knowledge that the use of gloves is or should be mandatory. See Cotter & Co. v. OSHRC, 598 F.2d 911 (5th Cir. 1979); B&B Insulation, Inc. v. OSHRC, 583 F.2d 1364 (5th Cir. 1978). The Secretary counters by arguing that proof of variance from industry custom should not be necessary to support a citation under § 1910.132(a) and, in the alternative, that actual knowledge by OCF of the need for gloves was established.
 
 
 8
 § 1910.132(a) is the general industry analog to 29 C.F.R. § 1926.28(a),[4] which requires the use of personal protective equipment to protect employees in the construction industry against hazards. We have previously held that §§ 1926.28(a) and 1910.132(a) are "general federal admonitions" providing little guidance to employers concerning the circumstances in which personal protective equipment is required and that the same standards apply to proof of a violation of either regulation. B&B Insulation; Cotter. Due process requires that employers be given reasonably clear advance notice of what is required of them by these regulations. For that reason, we held in B&B Insulation and Cotter that it is usually necessary to support a citation under either section that the Secretry show that an employer has failed either to provide personal protective equipment or to require its use, when it is the custom and practice in the particular industry to do so. Since we have today reaffirmed this position in S&H Riggers & Erectors, Inc. v. OSHRC, 659 F.2d 1273 (5th Cir. 1981), the Secretary's argument that industry custom should not be controlling is without merit.
 
 
 9
 If a violation of § 132 could be supported only by a showing that the employer failed to require safety equipment customarily required in its industry, we would be required to reverse and remand this case for further evidence on industry custom, as the evidence in this record is equivocal at best. The only evidence of industry custom is the testimony of OCF's plant manager, who testified that of two other fiberglass manufacturers having plants in north Georgia one had a voluntary glove program similar to OCF's and the other discouraged the use of gloves by its employees. This evidence is insufficient to support a determination whether OCF's glove program was in compliance with industry practice.
 
 
 10
 The industry practice standard adopted by this court is designed to satisfy the notice requirements of due process. But "(w)here 'an employer is shown to have actual knowledge that a practice is hazardous, the problem of fair notice does not exist.' " Cotter & Co., 598 F.2d at 914, quoting Cape & Vineyard Division of the New Bedford Gas and Edison Light Co. v. OSHRC, 512 F.2d 1148, 1152 (1st Cir. 1975). We have therefore held that an employer may be found in violation of § 1910.132(a), although his conduct conforms to the practices in his industry, if he has actual knowledge that a hazard requires the use of personal protective equipment. S&H Riggers; Cotter & Co. The Secretary argues, and we agree, that the evidence in this case amply establishes that OCF knew gloves were necessary to protect its employees from fiberglass itch.
 
 
 11
 Both the Commission and the ALJ found that OCF's voluntary glove program constituted an "implied recognition" of the need for gloves. Knowledge that personal protective equipment is required may not be implied from voluntary safety efforts standing alone. S&H Riggers; Cotter & Co. This does not mean, however, that an employer's safety efforts may never be considered in determining whether the employer has knowledge of the need for personal protective equipment. The purpose of the rule is to avoid discouraging employers from enhancing employee safety by providing safety equipment not required by OSHA regulations or industry practices. Cotter & Co., 598 F.2d at 915. Thus, an employer's safety program may be considered in support of a finding of knowledge along with other factors indicating to the employer the need for particular safety equipment. See Ryder Truck Lines, Inc. v. Brennan, 497 F.2d 230, 234 (5th Cir. 1974).
 
 
 12
 The facts of this case are more similar to those of Ryder Truck Lines than to those of S&H Riggers or Cotter & Co. In Ryder, although we did not use the term "actual knowledge," we rejected the employer's argument that it did not know of the need for safety shoes in light of the combined effect of a history of foot injuries among its employees and its sua sponte safety shoe program. In S&H Riggers, by contrast, one employer's "voluntary" safety efforts were a response to a citation for failure to require safety belts that the employer was then in the process of contesting; we held that this did not constitute recognition of the need for mandatory safety belts in light of the employer's excellent safety record and testimony that the employer by other means eliminated the cause of the only fall in its industry of which any of the witnesses were aware. The other employer's voluntary safety efforts were limited to the provision of safety belts on one prior occasion under circumstances significantly different from those on the job for which the citation was issued. In Cotter we held that an employer's voluntary provision of safety shoes did not show actual knowledge of the need for safety shoes where the employer had a record of only one foot injury in the previous two years that would have been prevented or mitigated by the use of safety shoes, and that one injury was the result of employee misconduct. In each case but Ryder the employer could reasonably believe that, either because of other safety precautions or because of the skill of its employees, the risk of injury was insufficient to require the mandatory use of personal protective equipment.
 
 
 13
 OCF is in a very different position from the employers in S&H Riggers and Cotter & Co. OCF's own evidence established that it had been aware for at least the last thirty years that many, if not most, employees exposed to fiberglass develop fiberglass itch when they begin employment and upon returning from any extended absence and that wearing gloves is the only way to prevent fiberglass itch. OCF contends that the hardening process is an adequate substitute for gloves, but it is clear that hardening does not prevent fiberglass itch, since an employee must endure from several days to a few weeks of fiberglass itch before his skin hardens and must go through the same process each time he returns from vacation or other extended absence from work.
 
 
 14
 OCF's position is also different from that of the employers in S&H Riggers and Cotter & Co. because of its employees' persistent demands for gloves. OCF contends that in providing gloves to its employees on a "voluntary" basis it, like the employer in Cotter & Co., was "merely ... accomodat(ing) the preferences of the employees," Cotter & Co., 598 F.2d at 915, and that this did not constitute recognition of the need for mandatory glove usage. It is apparent from the record, however, that OCF's glove program resulted from its employees' demands, through their union, that OCF provide gloves to all who desired them. There is no indication in Cotter & Co. that the employer's safety shoe program arose from persistent employee demands. We also believe that a program such as OCF's, under which employees were provided free of charge with gloves that in the ordinary course provided protection for only two weeks or thereabouts before requiring replacement, evidences a higher degree of awareness of the need for personal protective equipment than does a program such as Cotter's, under which employees were simply permitted to purchase safety shoes, a relatively durable item, from their employer rather than (if they wished to wear them) from another source.
 
 
 15
 OCF's position is also distinguishable from that of Cotter on the basis of the degree of employee demand for personal protective equipment. Only about one-half of Cotter's employees chose to wear safety shoes. Although OCF's plant manager estimated that between 20 and 40 percent of OCF's employees prefer not to wear gloves, this was only "a rough guess" and "could be way off." On the other hand, the compliance officer testified that all of the employees she interviewed expressed a preference for gloves, as did all those who testified. Moreover, the plant manager's estimate was based only on his observation of workers when walking through the plant, and considering the conceded failure in the past to replace gloves promptly upon request, it is possible that at least some of the employees he observed working without gloves were doing so not because they preferred to work without gloves, but because they were unable to obtain gloves.
 
 
 16
 OCF contends, however, that gloves are not required for workers handling fiberglass because fiberglass itch is a de minimus injury for the prevention of which mandatory personal protective equipment is not warranted. In support of this contention OCF points out that although employers are generally required to record and report injuries to the Secretary, see 29 U.S.C. § 657(c)(2); 29 C.F.R. Part 1904, injuries of the kind involved here are not required to be reported.[5] From this OCF concludes that such injuries are not within the purview of the Act. However, "the Act specifically encompasses non-serious violations, i. e., violations which do not create a substantial probability of serious physical harm. (29 U.S.C. § 666(j)). Avoidance of minor injuries, as well as of major ones, was intended to be within the purview of this liberal Act." Ryder Truck Lines, 497 F.2d at 233. The provisions of the Act and regulations requiring reporting of only serious injuries do not limit the authority of the Secretary to issue citations for failure to guard against hazards that present a substantial risk of less serious harm.
 
 
 17
 Because we affirm the Commission's determination that OCF violated § 1910.132(a) by failing to require its employees to wear gloves for protection against fiberglass itch we need not decide whether it also violated § 1910.132(a) by failing to require gloves as protection against hot glass. We note, however, that the evidence of actual knowledge is much weaker with respect to the hot glass hazard. Although there is substantial evidence in the record to support the conclusion that gloves are necessary to protect employees from exposure to hot glass, there is little or no evidence that either OCF or the fiberglass insulation industry as a whole was aware of this. OCF's plant nurse testified that although employees are instructed to report any injury, no matter how minor, there have been no reported injuries from contact with hot glass in the three years she has worked for OCF. Transcript at 209, 219-20.
 
 
 18
 While "(t)he goal of the Act is to prevent the first accident," Mineral Industries & Heavy Construction Group v. OSHRC, 639 F.2d 1289, 1294 (5th Cir. 1981), and "the Act does not establish as a sine qua non any specific number of accidents or any injury rate," Ryder Truck Lines, 497 F.2d at 233, a very low injury rate has a definite bearing on the question whether an employer has notice that personal protective equipment is necessary under a general regulation such as § 1910.132(a). An employer may be aware of a possible hazard, yet still lack notice that mandatory personal protective equipment is necessary, if the hazard has never given rise to an injury. Cotter & Co., 598 F.2d at 914. The ALJ found that the reason that OCF has not experienced a history of burns from hot glass was that most employees wear gloves. We agree with the Commission that there is no evidence in the record establishing the number of OCF employees who actually wore gloves, as opposed to the number who preferred to do so, but this is immaterial. Whatever the reason for the lack of burns from hot glass among OCF's employees, OCF could reasonably have concluded that it had taken sufficient precautions against the risk of burns from hot glass that the mandatory wearing of gloves was not required as a safeguard against that risk.
 
 
 19
 AFFIRMED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452 October 14, 1980
 
 
 [1]
 The standard established by the regulation provides:
 Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation, or physical contact.
 
 
 [2]
 There is apparently no known medical explanation for the "hardening" process. See OCF Exhibit B at 217
 
 
 [3]
 The citation also charged a violation of § 1910.132(a) by failure to require employees operating the "overwrap" machine (used to glue labels on rolls of insulation after they are removed from the dyken) to wear gloves to protect their hands from glue at a temperature of about 350 to 400 degrees. In its brief to the Commission, OCF conceded that these employees should be required to wear gloves, so this is no longer an issue
 
 
 [4]
 29 C.F.R. § 1926.28(a) provides:
 The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employee.
 
 
 [5]
 29 C.F.R. § 1904.12 provides in pertinent part:
 (c) "Recordable occupational injuries or illnesses" are any occupational injuries or illnesses which result in:
 (1) Fatalities, regardless of the time between the injury and death, or the length of the illness; or
 (2) Lost workday cases, other than fatalities, that result in lost workdays; or
 (3) Nonfatal cases without lost workdays which result in transfer to another job or termination of employment, or require medical treatment (other than first aid) or involve: loss of consciousness or restriction of work or motion. This category also includes any diagnosed occupational illnesses which are reported to the employer but are not classified as fatalities or lost workday cases.
 (d) "Medical treatment" includes treatment administered by a physician or by registered professional personnel under the standing orders of a physician. Medical treatment does not include first aid treatment even though provided by a physician or registered professional personnel.
 (e) "First Aid" is any one-time treatment, and any followup visit for the purpose of observation, of minor scratches, cuts, burns, splinters, and so forth, which do not ordinarily require medical care. Such one-time treatment, and followup visit for the purpose of observation, is considered first aid even though provided by a physician or registered professional personnel.