B & B INSULATION, INC., Petitioner,

v.

OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and F. Ray Marshall, Secretary of Labor, Respondents.

No. 77–2211.

United States Court of Appeals, Fifth Circuit.

Nov. 16, 1978.

P. Allan Port, Houston, Tex., for petitioner.

Carin A. Clauss, Sol. of Labor, U. S. Dept. of Labor, Benjamin W. Mintz, Assoc. Sol. for OSHC, Allen H. Feldman, Asst. Counsel for Appellate Litigation, Nancy L. Southard, Atty., Ray H. Darling, Jr., Executive Secretary, OSHRC, Thomas L. Holzman, Michael Levin, Counsel for Appellate Litigation, U. S. Dept. of Labor, Washington, D. C., for respondents.

Before RONEY, RUBIN and VANCE, Circuit Judges.

RONEY, Circuit Judge:

■ This Occupational Safety and Health Act case raises the question of whether an employer can be held in violation of a general federal admonition [29 C.F.R. § 1926.-28(a)] to require the "wearing of personal protective equipment" where there is "an exposure to hazardous conditions" where his conduct is representative of that of employers in his industry under similar circumstances. In holding that the employer cannot be so held, we sustain the regulation against a *facial* constitutional challenge, but limit its application to those conditions which the cited employer's industry would recognize as hazards requiring the use of safety equipment, the absence of which constitutes a violation. The result in this case is to reverse the Commission's assessment of a nonserious violation on the ground that there is not substantial evidence in the rec-

ord to support a finding that a reasonably prudent employer in the insulation industry would have understood that the use of safety belts was mandated by the conditions for which B&B was cited.

The employer, B & B Insulation, Inc. (B&B), pursuant to § 11 of the Occupational Safety and Health Act of 1970 (Act), 29 U.S.C.A. § 651 *et seq.*, petitioned for review of a final order of the Occupational Safety and Health Review Commission (Commission). This Court has jurisdiction under 29 U.S.C.A. § 660(a). The Commission determined that B&B violated section 5(a)(2) of the Act, 29 U.S.C.A. § 654(a)(2), by failing to comply with 29 C.F.R. § 1926.28(a), a safety standard promulgated thereunder.[1]

The facts of an accident which led to the citation are undisputed. B&B is an insulation subcontractor which employs approximately 250 employees. On August 9, 1974, B&B was engaged in insulation of steam pipes at a lumber company. The 8-inch steam pipe being insulated was located approximately 23 feet above the ground. Two feet above the steam pipe was a network of steel girders supporting a conveyor belt. Two feet below was a series or "rack" of three parallel pipes on which the foreman and one employee stood. The rack consisted of a 16-inch and a 14-inch pipe separated by a 15-inch space through which ran a third pipe of unspecified diameter. The foreman and an employee straddled the center pipe with one foot on each outside pipe and walked down the rack as insulation of the steam pipe progressed. A third employee, who remained on the ground,

---

1. The purpose of the Act, to assure safe and healthful working conditions, is accomplished in part by authorizing the Secretary of Labor to set mandatory occupational safety and health standards. 29 U.S.C.A. § 651(b)(3). The standards, applicable to all businesses affecting interstate commerce, *id.,* impose two types of duties on employers. The employer's "general duty" is to furnish employment and a place of employment free from "recognized hazards that are causing or are likely to cause death or serious physical harm." *Id.* § 654(a)(1). The employer must also comply with the specific

standards issued pursuant to the Act, which may also articulate general duties. *Id.* § 654(a)(2).

29 C.F.R. § 1926.28(a), a § 654(a)(2) standard, provides

The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.

tied sections of the insulation to a rope which was pulled up by the employee on the rack. The sections were then carried along the rack and delivered to the foreman who placed them around the steam pipe.

The insulation was secured with stainless steel wire until a permanent covering could be installed. The coil of wire remained on the ground with the running end trailing from the foreman's position on the rack. Nine feet below the rack, mounted on poles, ran the energized and uninsulated power lines of an electric trolley used to transport lumber.

On the date in question, the trailing wire came into contact with the power line and electrocuted the foreman. When the other employee on the rack touched the foreman's body, he received an electrical shock, lost consciousness, and fell backward over the pipes and into a concrete ditch below, fracturing his skull. Neither the foreman nor the employee wore a safety belt.

In response to this accident, an Occupational Safety and Health Administration (OSHA) compliance officer inspected the worksite on August 13 and 14, 1974. B&B was cited for a nonserious violation[2] because of failure to require its employees to use personal protective equipment, as required by 29 C.F.R. § 1926.28(a).[3] The cita-

tion was grounded on the failure to require the use of safety belts or lifelines.

B&B timely contested the citation and the $90 penalty, 29 U.S.C.A. § 659(c), and the Secretary of Labor filed a formal complaint. 29 C.F.R. § 2200.33. The administrative law judge vacated the citation and proposed penalty, finding "no evidence in the record to show that a reasonably prudent person, fully knowledgeable of the insulation installation business would have known that safety belts and lifelines would be necessary equipment within the meaning and intent of section 29 C.F.R. § 1926.-28(a)." On review the Commission reversed the decision by a 2–1 vote, affirming the citation and imposing a $90 penalty.

■ B&B argues that 29 C.F.R. § 1926.-28(a) is unenforceably vague for failure to provide employers with reasonable notice of what is required. We share B&B's concern with the generality of the standard's command.[4] We conclude, however, that its requirements are not unforeseeable if the standard is read to require only those protective measures which the knowledge and experience of the employer's industry, which the employer is presumed to share, would clearly deem appropriate under the circumstances.

---

2. The Act does not define a "nonserious" violation. The OSHA field operations manual states that nonserious violation citations are to be issued "where an accident or occupational illness resulting from violation of a standard would probably not cause death or serious physical harm, but which would have a direct or immediate relationship to safety or health of employees." *Occupational Safety and Health Administration, U. S. Dep't of Labor, Field Operations Manual* VIII–B2 (1974).

   The Act itself provides that a "serious violation" exists where "there is a substantial probability that death or serious physical harm could result . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C.A. § 666(j).

3. B&B was also cited for a serious violation of 29 C.F.R. § 1926.400(c) for permitting employees to work in close proximity to electric power lines which had not been de-energized or effectively insulated. That citation was affirmed by

the administrative law judge and further review was not sought.

4. Uncertainty as to what a standard requires has an economic impact on employers in the construction industry. Only the employer aware of his responsibility for often costly safety equipment is able to cover its cost in contract bids submitted before construction begins. If a contract bid includes costs which an employer thought required by the standard, but were not, his bid may be noncompetitive with those which did not include such cost, and he may lose the job. *See* Stokes, *Legal Considerations of the Occupational Safety and Health Act of 1970,* in the *Occupational Safety and Health Act* 75–76 (B.Walls ed. 1972); Sabo, *OSHA Problems in the Construction Industry, Proceedings of the American Bar Association National Institute on Occupational Safety and Health Law* (1976) 215–217, 222.

■ Because this is remedial civil legislation, rather than criminal, and because no potential deterrence of First Amendment activity is involved, the vagueness charge must be considered in light of the regulation's application. *United States v. National Dairy Products Corp.,* 372 U.S. 29, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); *Ryder Truck Lines, Inc. v. Brennan,* 497 F.2d 230, 233 (5th Cir. 1974).

Due process considerations mandate standards carrying "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo,* 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

No Circuit Court of Appeals has yet considered a vagueness challenge to 29 C.F.R. § 1926.28(a) in its present form. The regulation was initially promulgated pursuant to authority granted the Secretary of Labor in § 107 of the Contract Work Hours and Safety Standards Act, 40 U.S.C.A. § 333 (1969). When adopted by the Secretary on May 29, 1971 as an OSHA standard under 29 U.S.C.A. § 655(a), this "established Federal standard"[5] read as follows:

> The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions *and* where this part indicates the need for using such equipment to reduce the hazards to the employees.

(Emphasis added).

As so worded, the standard was held unenforceably vague by the Ninth Circuit in *Hoffman Construction Co. v. OSHRC,* 546 F.2d 281 (9th Cir. 1976), when applied to the asserted need for safety lines attached to a structure on which employees were working forty feet above the ground. The court acknowledged the danger involved as a matter of "general intuition." Noting the conjunctive structure of the standard's command, however, the court found no specific instructions among the subsections of Part 1926 to tell the employer when protective equipment is required. 546 F.2d at 283.

The regulation was reworded on December 16, 1972 to substitute "or" for the "and" in italics above. 37 Fed.Reg. 27,510 (1972). The *Hoffman* court expressly declined to comment on the revised versions.[6] 546 F.2d at 283 n.5.

Although the Commission has consistently upheld the standard as not unenforceably vague, each decision by the Commission has produced as many conflicting interpretations as there were participating commissioners, both under the old regulation,[7] and

---

**5.** The Act authorizes standards of three types: national consensus standards or established federal standards adopted for OSHA use within two years of the Act's effective date, 29 U.S.C.A. § 655(a), permanent standards developed by the Secretary of Labor along with an advisory committee, 29 U.S.C.A. § 655(b), and emergency temporary standards, 29 U.S.C.A. § 655(c).

An "established Federal standard" is any operative occupational safety and health standard established by any federal agency in effect at the enactment of the Act. 29 U.S.C.A. § 652(10). "National consensus" standards are those emanating from a nationally recognized standard producing organization. *Id.* § 652(9).

**6.** Commissioner Moran maintains that the standard in its present form is invalid because the Secretary failed to comply with rulemaking procedures of 29 U.S.C.A. § 655(b) in accomplishing the revision. The amendment, which claimed to make no substantive change, was achieved by mere substitution of "or" for

"and" in the Secretary's December 16, 1972 revision of construction standards. *See* 37 Fed.Reg. 27,503 (1972). Commissioner Moran argues that the original version remains in effect and requires, as suggested in *Hoffman,* designation of a particular construction standard requiring use of such equipment. *B & B Insulation, Inc.,* OSHRC Docket No. 9985, BNA 5 O.S.H.C. 1265 (1977) (Moran, dissenting).

In light of the "nonsubstantive" nature of the amendment, the other two commissioners have held that the amended version is to be read the same as the original. *Eichleay Corp.,* OSHRC Docket No. 2610, BNA 2 O.S.H.C. 1635 (1975).

B&B cites the *Hoffman* case as precedent but does not raise the claim of the amended regulation's invalidity on procedural grounds.

**7.** *See, Hoffman Construction Company,* OSHRC Docket No. 644, BNA 2 O.S.H.C. 1523 (1975); *Carpenter Rigging & Contracting Corp.,* OSHRC Docket No. 1399, BNA 2 O.S. H.C. 1544 (1975).

the new.[8] This case itself was decided with three different written opinions. This continuing "three-way split in the interpretation of the standard," as referred to in the concurring opinion of Commissioner Cleary, might well evidence to some the very vagueness charged by the petitioner. If the regulation is such that the commissioners themselves cannot agree upon what it demands, it may seem to require different things to different employers, the cornerstone of the uncertainty argument.

For the objectivity needed to rescue § 1926.28(a) from unconstitutional uncertainty, however, we look to cases construing analogous OSHA standards and to the tort law concept of the "reasonable man." Several circuits have upheld, despite its lack of precision, 29 C.F.R. § 1910.132(a), the subject standard's general industry analogue.[9] This Court rejected the employer's vagueness claim in *Ryder Truck Lines, Inc. v. Brennan,* 497 F.2d 230, 233 (5th Cir. 1974), finding that section drafted "with as much exactitude as possible in light of the myriad conceivable situations which could arise and which would be capable of causing injury." The Court identified as inherent in the standard, the test of whether or not a reasonable person would have recognized the hazard. In *Ryder* the hazard recognized by the "reasonable person" to warrant use of

protective footwear was that of foot injuries to dock workers in contact with heavy freight and equipment in a confined area.

The "reasonable person" test was also read into 29 C.F.R. § 1910.132(a) by the Fourth Circuit in *McLean Trucking Co. v. OSHRC,* 503 F.2d 8 (4th Cir. 1974). Again the use of protective footwear for loading dock workers was the safety obligation of which the employer was deemed to have notice. The reasonable person approach, the Court noted, accords with congressional purpose as reflected in the general duty clause of the statute itself,[10] the language of which is at least as imprecise as that of 29 C.F.R. § 1910.132(a).

In a third protective footwear case, *Arkansas-Best Freight Systems, Inc. v. OSHRC,* 529 F.2d 649, 655 (8th Cir. 1976), the Eighth Circuit endorsed the "reasonable person" interpretation, a test of foreseeability of danger warranting protective equipment, to determine the applicability of the difficult protective equipment standard.

In *Cape & Vineyard Div. v. OSHRC,* 512 F.2d 1148 (1st Cir. 1975), § 1910.132(a) was applied to an alleged failure of the employer to require protective equipment against electrical shock in utility company repair work. The "reasonable person" test was embellished to ask "whether a reasonably

---

8. *See, e. g., Lehr Construction Co.,* OSHRC Docket No. 7240, BNA 6 O.S.H.C. 1352 (1978); *State Home Improvement Co.,* OSHRC Docket No. 14098, BNA 6 O.S.H.C. 1249 (1977); *Sweetman Construction Co.,* OSHRC Docket No. 3750, 3 BNA O.S.H.C. 2056 (1976); *Isseks Brothers, Inc.,* OSHRC Docket No. 6415, BNA 3 O.S.H.C. 1964 (1976).

9. Construction work is governed by Part 1926 of the OSHA regulations. General industry standards catalogued in Part 1910 may also apply to the construction industry where no Part 1926 standards exist to cover working conditions in issue. 29 C.F.R. §§ 1910.5, 1910.-12.

 29 C.F.R. § 1910.132(a), a general industry standard, provides:
 Protective equipment . . . shall be provided, used, and maintained in a sanitary and reliable condition wherever it is necessary by reason of hazards of processes or environ-

ment, . . . encountered in a manner capable of causing injury or impairment in the function of any part of the body . . .

10. The statutory general duty clause [29 U.S.C.A. § 654(a)(1)] *see* note 1, *supra,* addresses "recognized hazards." In a floor speech proposing an amendment which became the final version of the general duty clause, Representative Daniels stated:
 A recognized hazard is a condition that is known to be hazardous, and is known not necessarily by each and every individual employer but is known taking into account the standard of knowledge in the industry. In other words, whether or not a hazard is "recognized" is a matter for objective determination; it does not depend on whether the particular employer is aware of it.
 116 Cong.Rec. 38377 (1970).

prudent man familiar with the circumstances of the industry would have protected against the hazard." 512 F.2d at 1152.

The *Cape & Vineyard* test was relied upon by the Ninth Circuit in *Brennan v. Smoke-Craft, Inc.,* 530 F.2d 843, 845 (9th Cir. 1976) to determine the need for protective gloves in the sausage manufacturing industry. It was endorsed most recently by the Second Circuit in *American Airlines, Inc. v. Secretary of Labor,* 578 F.2d 38, 41 (2d Cir. 1978), in the context of a requirement for protective footwear for airline cargo handlers.

The clarity of the standard *sub judice* is equally well served by the "reasonable person" approach if applied with a sensitivity to the circumstances in which it is used.

▬ The "reasonable man" is, of course, a fictional character borrowed from tort law wherein his conduct sets the standard below which behavior constitutes negligence. *See generally,* W. Prosser, *Law of Torts* at 149–80. Because the reasonable man personifies the community ideal of reasonable behavior, evidence of customary conduct of those similarly situated may be probative in determining his behavior. *Id.* at 166–68. *See, e. g., Ward v. Hobart Manuf. Co.,* 450 F.2d 1176, 1185 (5th Cir. 1971) (where defendant manufacturer conformed with standards prevailing in the industry and no strong evidence countered customary practices, this Court found little to indicate defendant's conduct was unreasonable). Custom is, however, not dispositive in negligence actions. "[W]hat ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *Texas & Pacific Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903).

The Commission here purported to decide what the reasonable employer in B&B's industry would have done under the conditions for which B&B was cited. The Commission's conclusion is inaccurate because it is based entirely upon the opinion of people employed by the Government and depends not at all upon the evidence drawn from the people employed by the industry. This application of the reasonable person rule stands the principle on its head. The common law reasonable man standard was developed and applied in direct reference to persons who would be subject to judgment by that standard. Here, the Commission would decide ad hoc what would be reasonable conduct for persons of particular expertise and experience without reference to the actual conduct which that experience has engendered. In other words, the Commission would assert the authority to decide what a reasonable prudent employer would do under particular circumstances, even though in an industry of multiple employers, not one of them would have followed that course of action.

This disregard of demonstrated industry custom is clearly beyond the intention of the cases which first borrowed the reasonable man theory to construe OSHA standards. As the Court said in *Ryder, supra:*

> So long as the mandate affords a reasonable warning of the proscribed conduct in light of common understanding and practices, it will pass constitutional muster.

497 F.2d at 233. In *Cape & Vineyard, supra* at 1152, the court observed that conduct of the reasonably prudent employer would generally be established by reference to industry custom and practice. The *Smoke-Craft* court, only after failing to find a relevant industry custom with which to compare the employer's conduct, sought other evidence that a reasonably prudent employer would have protected against the alleged hazard. *Smoke-Craft, supra* at 845. *But see, Allis-Chalmers Corp. v. OSHRC,* 542 F.2d 27, 30–31 (7th Cir. 1976).

▬ Where the reasonable man is used to interpolate specific duties from general OSHA regulations, the character and purposes of the Act suggest a closer identification between the projected behavior of the reasonable man and the customary practice of employers in the industry. The purpose

of the Act is preventive rather than compensatory.[11] Achievement of its goal of reducing industrial accidents depends upon employer compliance through elimination of legislatively identified safety and health hazards by prescribed remedial measures. Preventive goals are obviously not advanced where broad standards are extended to encompass every situation which gives rise to an unlikely accident.

■ The Act indicates that Congress thought specificity of standards desirable.[12] In light of the Acts preventive purpose and the intended specificity of its standards, the employer whose activity is not yet addressed by a specific regulation and whose conduct conforms to the common practice of those similarly situated in his industry should generally not bear an extra burden.

■ Where the Government seeks to encourage a higher standard of safety performance from the industry than customary industry practices exhibit,[13] the proper recourse is to the standard-making machinery provided in the Act, selective enforcement of general standards being inappropriate to achieve such a purpose.[14] The use of standard-making procedures assures that not only would employers be apprised of the conduct required of them and responsibility for upgrading the safety of the industry would be borne equally by all its members, but the resulting standard would benefit from input of the industry's experts,[15] both

11. *Id.* For example, the Act does not affect workmen's compensation in any way, 29 U.S.C.A. § 653(b)(4), and creates no private right of action for an injured employee against his employer. *Jeter v. St. Regis Paper Co.,* 507 F.2d 973 (5th Cir. 1975). Tort law, on the contrary, is concerned with providing for after-the-fact payment of damages by one whose negligence caused the injury. *See* 116 Cong.Rec. 38371 (1970) in which Congressman Steiger warned of the dangers of rigidly applying the tort law concept in an OSHA enforcement context.

12. The Senate Report, referring to standards promulgated by the Secretary under § 655(b), expresses the intention that they "shall represent feasible requirements, which, where appropriate, shall be based on research, experiments, demonstrations, past experience, and the latest scientific data. . . . Insofar as practicable, standards are to be expressed in terms of objective criteria and the performance desired." S.Rep. No. 91–1282, 91st Cong., 2d Sess., Reprinted in [1970] U.S.Code Cong. & Admin.News, pp. 5177, 5183–84. Detailed occupational safety and health regulations fill well over 1,000 pages of the Code of Federal Regulations. *See* 29 C.F.R. § 1910 *et seq.* The Senate Report emphasizes that the general duty clause would not be a substitute for reliance on specific standards. It would, rather, "simply enable the Secretary to insure the protection of employees who are working under *special circumstances for which no standard has yet been adopted.*" [1970] U.S.Code Cong. & Admin.News, *supra* at 5186 (emphasis added).

13. "In the area of safety, . . . the Secretary is not restricted by the status quo. He may raise standards which require improve-

ments in existing technologies or which require the development of new technology . . . .." *Society of Plastics Industry, Inc. v. OSHA,* 509 F.2d 1301, 1309 (2d Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482 (1975) (standard prohibits worker exposure to concentrations of vinyl chloride).

14. For a discussion of standards formulation through administrative rulemaking rather than ad hoc adjudication, *see Securities & Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 202, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). The Court advised "The function of filling the interstices of the [Holding Company] Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future."

Arguments against ad hoc standard setting in application of the Act's general duty clause are presented in Andrews and Cross, *Defending An Employer Against An Alleged Violation of the General Duty Clause,* 9 Gonzaga L.Rev. 399, 408–09 (1974); Morey, *The General Duty Clause of the Occupational Safety and Health Act of 1970,* 86 Harv.L.Rev. 988, 992–93 (1973). *But see, National Realty & Constr. Co., Inc. v. OSHRC,* 160 U.S.App.D.C. 133, 142, 489 F.2d 1257, 1266 n. 37 (1973).

15. *See generally, National Roofing Contractors Ass'n v. Brennan,* 495 F.2d 1294 (7th Cir. 1974), discussing promulgation of construction industry standards.

When the Secretary determines the need for a specific standard, he may receive comments from an advisory committee which must include persons qualified by experience and affiliation to present the views of employers and employees in the industry. 29 U.S.C.A. §§ 655, 656(b). The proposed standard is published

employer and employee, cost and technology obstacles faced by the industry could be weighed,[16] and more interested parties can participate in the process.

Viewed in the light of a constitutionally applied regulation, B&B's challenge of the evidentiary basis for the Commission's decision must be sustained.

■■■■ The Commission's findings are of course conclusive with respect to questions of fact where substantial evidence on the record considered as a whole supports them. 29 U.S.C.A. § 660(a). The Secretary has the burden of proving all elements of a violation. 29 C.F.R. § 2200.73. In this case that burden included a demonstration that a reasonable insulation industry employer would have used safety belts where B&B did not. Of the eleven witnesses who testified at the hearing, however, only the OSHA compliance officer who issued the citation to B&B believed that safety belts would have been appropriate under the circumstances. The compliance officer had never before issued a citation to employees working on a pipe rack without safety belts and had no statistics or personal knowledge concerning falls from pipe racks. He expressed a position similar to that espoused by Commissioner Cleary in the Commission

decision below that where a full hazard exists it must be protected against regardless of the degree of hazard or probability of a fall.[17]

Although having some simplistic appeal, such an approach to fall hazards would seem to require safety belts for an ordinary set of stairs, because people do fall down stairs from time to time, and are seriously injured. To state such a proposition is sufficient to refute the suggestion that Congress intended its regulations to go so far.

The Secretary of Labor introduced no evidence of customary procedures in the industry. B&B, on the contrary, produced a variety of witnesses representing labor and management to demonstrate that the "reasonable man" would have done no more than B&B under these circumstances.[18]

■■■ In absence of evidence that B&B's conduct fell below the demonstrated practice in the industry, the Commission's decision was not supported by substantial evidence.

REVERSED.

---

and interested persons are permitted to submit written comments and may demand a public hearing on the proposal. 29 U.S.C.A. § 655(b)(2), (3).

16. *See American Petroleum Institute v. O.S.H.A.*, 581 F.2d 493 (5th Cir. 1978); *American Federation of Labor v. Brennan*, 530 F.2d 109, 121–122 (3d Cir. 1975); *Industrial Union Dep't, AFL–CIO v. Hodgson*, 162 U.S.App.D.C. 331, 342, 499 F.2d 467, 478 (1974).

17. Commissioner Cleary found the risk of a fall in this case to be demonstrated by the fatal fall which occurred and regarded resort to industry practice or even injury records unnecessary. *B&B, supra* at 1270. We reject Commissioner Cleary's approach, observing that prevention is not served by hindsight determinations of hazardous conditions and that the Act is not intended to make the employer guarantor of his employees' safety in circumstances where occurrence of injury is neither likely nor foreseeable.

18. For example, the business manager of Asbestos Local 22 testified that the danger of construction people falling off pipes is minimal. The foreman of Union Carbide and president of the local said that he would not have worn a safety belt under these conditions, considering them nonhazardous. The local supervisor of the Construction Services Division of Owens-Corning Fiberglass testified that accident statistics do not exist for these circumstances and it is probably not a risk area. He would not have thought safety belts required by OSHA regulations in this case. The president of Fuller-Austin Insulation Co. testified that he would not have required further safety measures in this situation. He had served as a member of the National Insulation Contractors Association committee on OSHA matters several years before and would not have interpreted the standard to require further safety measures under the cited conditions.