FILED
United States Court of Appeals
Tenth Circuit

December 19, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

| | |
|---|---|
| COMPASS ENVIRONMENTAL, INC., | |
| Petitioner, | |
| v. | No. 10-9541 |
| OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION; DEPARTMENT OF LABOR, | |
| Respondents. | |

**ON PETITION FOR REVIEW OF A FINAL ORDER OF THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION (OSHRC No. 06-1036)**

Jim Michael Hansen of Jim M. Hansen, P.C., Golden, Colorado, for Petitioner.

Gary K. Stearman, Attorney, United States Department of Labor (M. Patricia Smith, Solicitor of Labor; Joseph M. Woodward, Associate Solicitor of Labor for Occupational Safety and Health; and Charles F. James, Counsel for Appellate Litigation, with him on the brief), Washington, D.C., for Respondents.

Before **HARTZ**, **McKAY**, and **GORSUCH**, Circuit Judges.

**McKAY**, Circuit Judge.

In this case, we are called upon to review a final order of the Occupational

Safety and Health Review Commission finding a serious violation of a safety

regulation and assessing a $5,500 penalty against Petitioner Compass Environmental. Specifically, the Commission held that Compass violated 29 C.F.R. § 1926.21(b)(2) by failing to train a now-deceased employee to recognize and avoid the electrocution hazard presented by a high-voltage overhead power line at his worksite in Fort Lupton, Colorado. In its petition for review, Compass argues that the Commission failed to apply the correct legal test and erred in concluding that a reasonably prudent employer would have anticipated this employee's potential exposure to the power line.

## BACKGROUND

In early 2006, Compass began construction on an underground slurry wall at a surface mine site in Fort Lupton, Colorado. As part of this project, a mobile excavator with a 75-foot boom was used to dig a trench for the slurry wall. The two-man excavator crew consisted of the excavator operator and a trench hand, whose responsibilities included checking the trench depth, greasing the excavator, and watching for problems with the excavator that the operator could not see. When the trench hand greased the excavator, he would hold a grease line—a rubber and metal hose with a metal nozzle for dispensing grease—which was connected to the excavator. He performed this work after each cut by the excavator, generally at the same time other maintenance, including refueling, was performed.

The trench hand was a new employee who joined the team one week into

-2-

the project. During the first week of the project, Compass prepared Job Safety Analyses and instructed employees on the hazards identified therein. The Job Safety Analysis specific to the excavator operator and trench hand identified various hazards associated with the trench excavation, including the hazard posed by the energized power line that crossed over one end of the construction site. According to the Job Safety Analysis, the excavator operator and trench hand were to be instructed to maintain a "20 ft. clearance between [the excavator and] overhead lines." (R. at 19533.) However, because of the trench hand's later start date, he was not present during the training on this Job Safety Analysis. Moreover, while he was given individual safety training, this training did not include any instructions on the overhead power line.

This power line crossed one end of the construction site at a maximum height of 34 feet above the ground. The 7,200-volt line was being used to power the electrical pump at the surface mine's gravel pit, and thus the mine owner wanted to keep it energized as long as possible. When the digging began to approach the power line in the middle of March 2006, Compass informed the mine owner that the line would soon need to be de-energized and removed so Compass could move its equipment into this area. The line was still energized, however, on March 18, 2006, when the excavator reached a point less than two hundred feet from the overhead line.

Compass had given no specific instructions to employees on how or where

to refuel the excavator, but Compass managers testified that the excavator was always refueled in the same way. At the end of the work day, the operator would move the excavator about twenty or thirty feet away from the trench onto more stable ground and then wait for a portable 300-gallon fuel tank to be brought to the excavator by a forklift. Although there was no policy against doing so, Compass managers testified that prior to March 18, 2006, the operator never moved the excavator off its compacted dirt work pad or did anything except wait for the forklift to bring the fuel tank to the excavator.

On March 18, however, the excavator operator decided not to call for the forklift to bring the portable fuel tank to him. Instead, he moved the excavator off of the work pad and walked it towards the fuel tank, which the forklift operator had left beneath the energized power line. The trench hand walked beside the excavator with the excavator's grease line in his hand, and the boom was extended so the trench hand could reach it with the grease gun. Unfortunately, when the excavator came near the fuel tank, its 75-foot boom came close enough to the power line for an electric current to pass from the line to the excavator and then through the grease line to the trench hand, killing him.

Following an investigation, the Secretary of Labor issued Compass a two-item serious citation for failing to adequately train the operator and trench hand and for failing to maintain proper clearance of the power line. The citation was challenged by Compass and vacated by an administrative law judge who held,

inter alia, that the trench hand's exposure to the energized power line was not foreseeable. The Secretary of Labor petitioned the Occupational Safety and Health Review Commission for review of the ALJ's dismissal of the training violation as it pertained to the trench hand. On review, the Commission concluded that a reasonably prudent employer would have anticipated the trench hand's exposure to the overhead power line and provided him with training addressing this electrocution hazard. The Commission therefore reversed the ALJ's vacatur of this portion of the citation and assessed a penalty of $5,500. Compass then filed this petition for review.

**DISCUSSION**

We review the Commission's factual findings under a substantial evidence standard, which is satisfied if "'a reasonable mind' would consider the evidence adequate to support the conclusion reached." *Universal Constr. Co. v. Occupational Safety & Health Review Comm'n*, 182 F.3d 726, 732 (10th Cir. 1999). We review the Commission's legal conclusions "to determine if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* Our review under this standard is narrow and highly deferential to the agency. *Id.*

The first issue we must consider is whether the Commission used the correct legal test to determine whether the Secretary proved a violation of 29 C.F.R. § 1926.21(b)(2), which provides:

-5-

each employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.

Compass argues that an OSHA violation can only be established through application of the four-part test set forth in *Secretary v. Atlantic Battery Co.*, 16 BNA OSHC 2131, 2138 (1994), and several other Commission cases. Under this test, to establish a violation of an occupational safety or health standard, the Secretary must prove "(a) the applicability of the cited standard, (b) the employer's noncompliance with the standard's terms, (c) employee access to the violative conditions, and (d) the employer's actual or constructive knowledge of the violation (i.e., the employer either knew, or with the exercise of reasonable diligence could have known, of the violative conditions)." *Id.* In this case, rather than applying this generic four-part test, the Commission applied a more training-specific test and focused on the issue of whether a reasonably prudent employer would have anticipated the trench hand's exposure to the overhead power lines and provided him with training on this hazard. *See N&N Contractors, Inc.*, 18 BNA OSHC 2121, 2125 (No. 96-0606, 2000) ("To establish noncompliance with a training standard, the Secretary must show that the cited employer failed to provide the instructions that a reasonably prudent employer would have given in the same circumstances.").

We are not persuaded that the Commission erred in focusing its inquiry on

this question.  Nothing in the pertinent statutes or regulations mandates application of the four-part *Atlantic Battery* test for an alleged § 1926.21(b)(2) violation, nor has Compass pointed us to any binding precedent that so requires. We note this is not the first case in which the Commission has foregone the generic four-part test in favor of a more specific test for training violations.  *See, e.g.*, *Capform, Inc.*, 19 BNA OSHC 1374 (No. 99-0322, 2001); *Baker Tank Co.*, 17 BNA OSHC 1177 (No. 90-1786, 1995).  Indeed, the generic test, while appropriate for many types of OSHA violations, has proven ill-fitted in determining whether the § 1926.21(b)(2) training standard has been violated.  The fourth prong of this test—employer knowledge of the violative condition—will almost invariably be present where the alleged violative condition is inadequate training of employees.  *See, e.g.*, *Andrew Elec. Co.*, 22 BNA OSHC 1593 (No. 08-0103, 2009) (ALJ) ("The standard at 29 C.F.R. § 1926.21(b)(2) addresses safety training, so the employer necessarily knows whether or not it instructed each employee in the recognition and avoidance of unsafe conditions . . . ."); *Lane Constr. Corp.*, 23 BNA OSHC 1097 (No. 09-0348, 2009) (ALJ) ("As the employer, Lane had actual knowledge of its training program.").  As for the third prong—employee access to the violative condition—this factor is inapplicable on its face in the context of § 1926.21(b)(2), where the violative condition is inadequate or nonexistent training.  It is nonsensical to ask whether an employee had access to a lack of training.  Even where adjudicators have stretched the

-7-

language of the test to ask instead whether employees had access to a hazard that training should have warned against, this prong has not proven very useful. *See, e.g.*, *Andrew Elec.*, 22 BNA OSHC 1593 (concluding that an employee was necessarily exposed to a hazardous condition because this hazardous condition caused his death).

Moreover, even under the training-specific test applied by the Commission in this case, an employer will not be found to have committed a training violation unless it "failed to provide the instructions that a reasonably prudent employer would have given in the same circumstances." *El Paso Crane & Rigging Co.*, 16 BNA OSHC 1419, 1424 (No. 90-1106, 1993). An employer's obligation to train is accordingly "dependent upon the specific conditions [at the worksite], whether those conditions create a hazard, and whether the employer or its industry has recognized the hazard." *W.G. Fairfield Co.*, 19 BNA OSHC 1233, 1236 (99-0344, 2000). "Employees must be given instructions on '(1) how to recognize and avoid the unsafe conditions which they may encounter on the job, and (2) the regulations applicable to those hazardous conditions.'" *Capform*, 19 BNA OSHC at 1376 (quoting *Superior Custom Cabinet Co.*, 18 BNA OSHC 1019, 1020 (No. 94-200, 1997). Thus, the Commission's training-specific test is not untethered to the specific conditions in the workplace and the particular hazards to which employees may be exposed. This test simply considers these factors through an approach better tailored for this particular context than the generic *Atlantic*

*Battery* test. We see no error in the Commission's use of a training-specific test to assess whether Compass violated § 1926.21(b)(2).[1]

Having so decided, we next consider whether the Commission erred in its application of this training-specific analysis to the facts of the instant case. To prove a violation of the training standard, the Secretary was required to prove that Compass failed to provide the instructions that a reasonably prudent employer would have given in the same circumstances. *See El Paso Crane*, 16 BNA OSHC at 1424. These circumstances include "the specific conditions [at the worksite], whether those conditions create a hazard, and whether the employer or its industry has recognized the hazard." *W.G. Fairfield Co.*, 19 BNA OSHC at 1236. Here, the overall worksite included high-voltage power lines, which posed a severe hazard to any employee who might contact them in some way. Moreover, the employer recognized this hazard—particularly as it applied to the trench hand and excavator operator—and trained most of its employees at the worksite on safety measures to take near overhead lines. Compass now argues, however, that this training was unnecessary and does not prove that a reasonably prudent

---

[1] In so holding, we do not mean to suggest that the four *Atlantic Battery* prongs are all irrelevant to a training violation. A violation of § 1926.21(b)(2) cannot be found where, for instance, the standard is inapplicable. And the second *Atlantic Battery* prong will necessarily be satisfied if the Secretary shows noncompliance under the training-specific test. The Commission was not required, however, to recite the mantra of the four-part *Atlantic Battery* test in order to evaluate the relevant factors in the instant case.

-9-

employer would have trained the trench hand on this hazard as well.

We are not persuaded by this argument. An employer's identification of and training on a specific hazard is certainly relevant to the question of whether a reasonably prudent employer would have provided training on this hazard. *Cf. Cape & Vineyard Div. v. Occupational Safety & Health Review Comm'n*, 512 F.3d 1148, 1154 (1st Cir. 1975) ("The company's own safety rules certainly may be treated as evidence of its awareness of the hazard which caused Thayer's death.").[2] Moreover, Compass recognized this hazard as being particularly applicable to the excavator operator and trench hand, and this recognition, in combination with the training provided to the operator and other employees, is sufficient to support the Commission's conclusion that a reasonably prudent employer would have trained the trench hand on this hazard. Nor does it seem unduly burdensome to require an employer to train its employees on a known severe hazard at a mobile construction worksite where unanticipated

---

[2] As the dissent notes, the court in *Cape* ultimately reversed the finding of a violation, holding that the company safety rule at issue in that case was insufficient to prove that the company failed to follow reasonably prudent practices. The court reached this conclusion because the relevant company rule—a general requirement to wear "sufficient" protective covering while working "close to live wires"—was far too general and broadly phrased to prove that a reasonably prudent employer would have required the specific additional safety measures asserted by the Secretary. *Cape*, 512 F.2d at 1154. In this case, by contrast, Compass identified this specific position for training about this particular electrical hazard. Thus, Compass's job safety analysis constituted clear evidence regarding the key issue in this case—whether a reasonably prudent employer would have trained the trench hand on this hazard.

contingencies may arise. "One purpose of the Act is to prevent the first accident." *Lee Way Motor Freight, Inc. v. Secretary of Labor*, 511 F.2d 864, 870 (10th Cir. 1975).

Although Compass might not have been able to predict the manner in which the trench hand would be exposed to this hazard, we conclude that the Commission did not abuse its discretion in holding that Compass should have trained the trench hand on the fatal danger posed by the high-voltage lines located in the vicinity of his work area. Because it is undisputed that Compass did not give this employee any instructions on this hazard, we see no abuse of discretion in the Commission's conclusion that Compass violated § 1926.21(b)(2).

## CONCLUSION

The Commission's decision is **AFFIRMED**.

10-9541, *Compass Environmental, Inc. v. OSHA*

**GORSUCH, J.**, dissenting:


Administrative agencies enjoy remarkable powers in our legal order. Their interpretations of ambiguous statutes control even when most everyone thinks Congress really meant something else. Their regulations bind as long as they can make the modest boast that they haven't behaved arbitrarily or capriciously. Their factual findings rule the day unless someone can show they have not just erred but clearly erred. Still, there remains one thing even federal administrative agencies cannot do. Even they cannot penalize private persons and companies without *some* evidence the law has been violated. Yet that's what we're being asked to countenance in this case and why I would grant the petition for review.

To sustain her charge that Compass violated 29 C.F.R. § 1926.21(b)(2), the Secretary concedes she bore an evidentiary burden. A burden of showing that reasonably prudent employers in the industry would have anticipated the sort of electrical hazard that trench hand Christopher Carder encountered in this case and provided him with more training about it than Compass did. *See Compass Environmental, Inc.*, 23 BNA OSHC 1132, at *2-3 (No. 06-1036, 2010). The Secretary concedes she bore this burden, no doubt, because the OSH Act and its accompanying regulations seek to prevent rather than compensate for injuries — and in doing so they admit that some accidents, though regrettable, are so unlikely even entirely reasonable employers wouldn't anticipate or train for them. *See,*

*e.g.*, *B & B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1371 (5th Cir. 1978);

*Brennan v. OSHRC*, 501 F.2d 1196, 1199-1200 (7th Cir. 1974).

Though well aware of the burden she faced in this case, the Secretary —

remarkably — failed to present *any* proof to satisfy it.  The ALJ dismissed the

citation against Compass for exactly this reason, explaining that

> [i]n this case, Donnie Wren, a[n] experienced crane operator, failed to
> maintain 20 feet of clearance between the Komatsu [excavator] and the
> [overhead power lines], in contravention of his training and years of
> experience. . . .
> . . . .
> The record establishes [that] Compass . . . trained its Komatsu operator in
> the hazards associated in moving the excavator near [overhead electrical]
> lines. . . .
> . . . .
> [On the day of the accident,] [t]he Komatsu was digging 200 feet from the
> [overhead] power lines and was not expected to reach the area under the
> lines until the following week, at which time the lines were to have been
> removed.  All the witnesses testified that . . . [s]ervicing [and fueling were]
> performed on the Komatsu in situ [at the trench where it operated, nowhere
> near the power lines]. . . .
>
> None of the witnesses could explain why Wren deviated from standard
> operating procedures by walking the Komatsu away from [its work site to
> the area with the power lines] on the day of the accident.  The Secretary
> introduced no evidence establishing Compass should have foreseen [he]
> would do so, taking Carder with him.

*Compass Environmental, Inc.*, No. 06-1036 at *5-6, 8 (OSHRC Jan. 22, 2008).

These are the sad facts of the case as it comes to us.  The Secretary's proof

shows that the excavator operator defied years of training and experience — first

by moving the excavator from the trench for refueling, and then by failing to

maintain 20 feet of clearance from the overhead electrical lines when he did.  The

-2-

proof shows that a tragic accident ensued. But the proof is silent on the question whether reasonably prudent employers in the industry would have done more to anticipate or train a trench hand for the accident than Compass did. Before us, the Secretary *asserts* that a reasonable employer would have done more but in support of this assertion she offers no *evidence*.

And that should be more than enough to grant the petition for review. However little the "substantial evidence" standard of review requires of an agency, however forgiving the "arbitrary and capricious" formulation of the APA may be, this court's role isn't so utterly ineffectual as to require (or permit) us to affirm an agency decision that is (as the ALJ found) unsupported by *any* proof on the (concededly) dispositive legal question. The law requires the Secretary to produce evidence, not issue Delphic declarations, about the practices of reasonable employers in the field. *See Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 732 (6th Cir. 1980) (explaining that the reasonable employer standard doesn't mean "whatever requirement the ALJ and two Commissioners agree" on but is "an objective test which must be determined on the basis of evidence in the record"). No doubt if the rule were otherwise — if the Secretary could cite companies for violations based on a mere assertion of unreasonableness — substantial constitutional due process and vagueness questions would quickly follow. *See id.* (rejecting vagueness and due process challenges to an OSHA regulation precisely and only because the reasonable employer standard

guarantees that "an employer familiar with the circumstances of the industry . . . [has] adequate warning of the conduct required by the regulation").

Perhaps recognizing the problem, the Secretary notes that Compass trained other employees about the dangers of electricity lines. She says that Mr. Carder was hired after the construction project began and most everyone else was trained. She tells us that everyone else heard from Compass about electrical hazards. She concedes that Mr. Carder received training when he arrived late on the scene, but stresses that it's unclear whether his training included the same information about electrical hazards everyone else heard. From all this, the Secretary asks us to assume that Compass at least violated its own internal policies by failing to warn Mr. Carder.

This can't fill the evidentiary void either. Even if we were willing to assume with the Secretary that Compass violated its internal policies by failing to warn Mr. Carder about electrical hazards, that still wouldn't prove it violated industry norms. By the Secretary's admission, § 1926.21(b)(2) doesn't punish companies for failing to adhere to their internal practices and customs. It punishes them for failing to act as reasonably prudent employers in the field do. And the fact remains that the Secretary presented no proof on *that* question.

Neither can we overcome the problem for the Secretary by presuming that Compass's internal practices and industry practices are one and the same. Internal company rules may (and often do) go above and beyond industry

-4-

standards.  Companies, after all, compete for labor and business, and worker safety is one dimension on which that competition can and does occur.  Holding a company liable for failing to follow its internal policies — without some proof from the Secretary suggesting that those policies are congruent with (not more protective than) industry norms — risks discouraging employers from adopting more protective plans and encouraging them instead to devolve to the lowest common denominator and the most minimal training regimes.  A result, of course, that would undermine rather than advance worker safety and the law's cause — and a point we have long recognized in analogous contexts.  *See generally Hinds v. Sprint/United Management, Co.*, 523 F.3d 1187, 1198-99 (10th Cir. 2008) (holding in the employment discrimination context that "the mere failure of a company's employees to follow their employer's manuals . . . without more, does nothing to suggest discrimination" and explaining that a contrary holding would risk "[d]issuading employers from implementing programs or policies to prevent discrimination," a result "directly contrary to the purposes underlying" the law) (quotation omitted).

For all these reasons, it comes as no surprise that the Secretary is unable to cite a single case from any other circuit holding a company liable under § 1926.21(b)(2) simply because it failed to follow an internal policy.  In fact, every other circuit has recognized, as Justice (then Judge) Breyer once explained, that "a vaguely worded, open-ended regulation like [29 C.F.R. § 1926.28(a)] . . .

must [ordinarily] be read to penalize *only conduct unacceptable in light of the common understanding and experience of those working in the industry*." *F.A. Gray, Inc. v. OSHRC*, 785 F.2d 23, 25 (1st Cir. 1986) (Breyer, J.) (quotations omitted) (emphasis added); *see also Tri-State Roofing & Sheet Metal, Inc. v. OSHRC*, 685 F.2d 878, 880 n.1 (4th Cir. 1982); *B & B Insulation*, 583 F.2d at 1370 (5th Circuit); *Ray Evers Welding Co.*, 625 F.2d at 732 (6th Circuit); *L.R. Willson & Sons, Inc. v. OSHRC*, 698 F.2d 507, 514 (D.C. Cir. 1983). We would do well to follow where our sibling circuits have led.

Of course, the Secretary directs us to *Cape & Vineyard Div. v. OSHRC*, 512 F.2d 1148, 1154 (1st Cir. 1975). But, as it turns out, that case didn't go nearly as far as the Secretary seeks to go in this one. *Cape* did not hold that a violation of internal company rules, without any other proof of industry practice, is enough. To the contrary, the First Circuit acknowledged merely that evidence about a company's internal safety rules can usefully contribute to the project of obtaining an accurate picture of industry norms — a modest proposition no one disputes. Then, having said that, the First Circuit proceeded to *reverse*, not affirm, an OSHA citation based on a violation of internal company rules. And among the various reasons it offered for that holding, the court observed that a contrary result "would needlessly discourage [employers] from exhorting employees to take every possible safety precaution." *Id*. Exactly so.

Having said that the Secretary has failed to prove a violation of industry

norms isn't to say she lacks the power to deviate from industry norms.  Far from it.  The Secretary can try to prove the standards of the industry in question are too lax even for a reasonably prudent employer — though of course "such negligence on the part of a whole industry cannot be lightly presumed" and "must be proven" with evidence.  *Ray Evers Welding Co.*, 625 F.2d at 732; *see also L.R. Willson & Sons, Inc.*, 698 F.2d at 514 ("In the absence of [industry] evidence, the Secretary must provide alternative, probative evidence . . . to meet his burden of proof."). Alternatively, the Secretary can even more straightforwardly engage "the standard-making machinery provided in the Act" to announce safety regulations employers must abide whether they are customary or not — a process that places all comers on notice of the need to meet new and higher standards.  *B & B Insulation*, 583 F.2d at 1371.

The problem in this case is the Secretary made no effort to pursue any of these options.  Instead, she chose to proceed under a regulation that required her to prove that reasonably prudent employers in the industry would have provided Mr. Carder with more training than he received from Compass.  Then she failed to produce any proof on that question.  And now she still seeks to hold Compass liable.  The Secretary's administrative powers and available policy options are considerable, even vast.  But this far they do not lawfully stretch.  Respectfully, I would grant the petition for review.